**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

RAMAH NAVAJO SCHOOL BOARD, INC.,

    Plaintiff,

vs.                                                      Civ. No. 07-289 MV/ACT

MICHAEL O. LEAVITT, Secretary of the
U.S. Department of Health & Human
Services; CHARLES W. GRIM, Director of
the Indian Health Service; JAMES L. TOYA,
Director of the Albuquerque Area Office of
the Indian Health Service; and the UNITED
STATES OF AMERICA,

    Defendants.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Plaintiff's Motion for Immediate Mandatory Relief, filed May 17, 2007, **[Doc. No. 10],** and Defendants' Motion for Summary Judgment and to Dismiss, filed June 11, 2007, **[Doc. No. 17]**. The Court, having considered the motions, responses, replies, relevant law, and being otherwise fully informed, finds that the Motion for Immediate Mandatory Relief is well-taken and will be **GRANTED in part** and that the Motion for Summary Judgment and to Dismiss is not well-taken and will be **DENIED**.

**BACKGROUND**

In this action, Plaintiff Ramah Navajo School Board, Inc. ("RNSB"), an Indian tribal organization in Pine Hill, New Mexico, challenges Defendants' denial of RNSB's proposal for a tribal-shares contract under the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 450 *et seq.* ("ISDEAA").

## I. The Indian Self-Determination and Education Assistance Act

The ISDEAA directs the Secretary of Health and Human Services and/or the Secretary of the Interior ("Secretary"),[1] upon request of an Indian tribe, to enter into contracts or compacts with the tribe (known as self-determination contracts) that provide funding to the tribe to administer various programs, such as tribal health services, that the Secretary would otherwise administer. The purpose of the ISDEAA is to promote tribal autonomy and self-determination by permitting tribes to operate programs previously operated by the federal government while also ensuring that the tribes do not suffer a reduction in funding for those programs simply because they assume direct operation of them. *See, e.g., Cherokee Nation of Okla. v. Thompson*, 311 F.3d 1054, 1055 (10th Cir. 2002), *rev'd on other grounds*, 543 U.S. 631 (2005).

### A. Approval of a Self-Determination Contract

The ISDEAA requires the Secretary to approve a self-determination contract unless one of five specified grounds for declination exist:

> [T]he Secretary shall, within ninety days after receipt of the proposal, approve the proposal and award the contract unless the Secretary provides written notification to the applicant that contains a specific finding that clearly demonstrates that, or that is supported by a controlling legal authority that-
>
> (A) the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory;
>
> (B) adequate protection of trust resources is not assured;
>
> (C) the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract;

---

[1] *See* 25 U.S.C. § 450b(I) (providing that the term "Secretary," unless otherwise designated, means either the Secretary of Health and Human Services or the Secretary of the Interior or both).

> (D) the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 450j-1(a) of this title; or
>
> (E) the program, function, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope of programs, functions, services, or activities covered under paragraph (1) because the proposal includes activities that cannot lawfully be carried out by the contractor.

25 U.S.C. § 450f(a)(2).

### B. Content of a Self-Determination Contract

Every self-determination contract entered into under the ISDEAA must either contain or incorporate by reference the provisions of a model agreement prescribed by the ISDEAA. 25 U.S.C. § 450*l*(a). The model agreement provides that "no modification to this Contract shall take effect unless such modification is made in the form of a written amendment to the Contract, and the Contractor and the Secretary provide written consent for the modification." *Id* at § 450*l*(c).

### C. Funding of a Self-Determination Contract

The ISDEAA specifies that the government must pay a tribe's costs of administering a program under a self-determination contract, including administrative expenses. *See* 25 U.S.C. §§ 450j-1(a)(1) & (2). Administrative expenses include (1) the amount that the agency would have spent "for the operation of the program" had the agency itself managed the program, § 450j-1(a)(1), and (2) "contract support costs," § 450j-1(a)(2). The ISDEAA defines "contract support costs" as other "reasonable costs" that a federal agency would not have incurred, but which nonetheless "a tribal organization" acting "as a contractor" would incur "to ensure compliance with the terms of the contract and prudent management." *Id*. "[C]ontract support costs" can include indirect administrative costs, such as special auditing or other financial

3

management costs, § 450j-1(a)(3)(A)(ii), direct costs, such as workers' compensation insurance, § 450j-1(a)(3)(A)(i), and certain startup costs, § 450j-1(a)(5).

The ISDEAA, however, provides a significant caveat to the government's funding obligations:

> Notwithstanding any other provision in this subchapter, the provision of funds under this subchapter is subject to the availability of appropriations and the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this subchapter.

25 U.S.C. § 450j-1(b); *see also* 25 U.S.C. § 450j(c) ("The amounts of [self-determination] contracts shall be subject to the availability of appropriations."). The first clause in § 450j-1(b) is called the "availability clause" and the second clause is called the "reduction clause."

## II. Funding of Contract Support Costs

The adequacy of the funding provided for contract support costs has been a recurring and troublesome issue. *See Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455, 1462 (10th Cir. 1997) ("The legislative history indicates one of the primary concerns of Congress in enacting the amendments [to the ISDEAA] was the chronic underfunding of tribal indirect costs and the potential this underfunding caused for tribes to retrocede programs back to the federal government." (citing S.Rep. No. 100-274 at 8-13 (1987)); United States General Accounting Office, Indian Self-Determination Act: Shortfalls in Indian Contract Support Costs Need to Be Addressed, at p. 3 (June 1999) (noting that while "Tribes' allowable contract support costs have tripled from 1989 through 1998-increasing from about $125 million to about $375 million . . .. Congress has not funded contract support to keep pace with these increases, resulting in funding shortfalls"). According to affidavits submitted by Defendants, Congress has consistently

underfunded contract support costs and, for at least the last ten years, has never fully funded them, leaving Indian Health Services ("IHS") and the tribes with significant shortfalls every year. Black Decl. at ¶ 11. For fiscal year 2007, Defendants estimate that the shortfall exceeded eighty million dollars. *Id*.

## III. RNSB's Proposed Self-Determination Contract

Since the late 1970's, RNSB has provided health care services at Pine Hill Clinic pursuant to a self-determination contract under the ISDEAA. At some point in 2006, RNSB sought to add its newly discovered tribal shares entitlement to its existing mature contract for the operation of the Pine Hill Clinic pursuant to 25 U.S.C. § 450f(a)(1). IHS informed RNSB that tribal share funds could not be added to RNSB's existing mature contract but must be the subject of a separate contract proposal.

In accordance with IHS's instructions, on October 17, 2006, RNSB submitted a proposal to enter a new self-determination contract to use its tribal share funds to provide additional health care services at the Pine Hill Clinic. RNSB's proposal requested a contract that would provide direct program funding as well as contract support costs.

In a letter dated October 31, 2006, IHS identified a number of deficiencies in RNSB's proposal, including the fact that IHS "does not have contract-support-cost funding available for [programs] such as the ones contained in this Proposal." The letter stated that "the Director of Indian Health Services has provided specific language relating to the lack of [contract support cost] funding that must be included in any contract for new and expanded [programs, functions, services and activities]." The specific language IHS proposed to include stated:

> The IHS has informed the Tribe that a congressional earmark has capped the amount of [contract-support-cost] funds available in the IHS [] appropriation and

> that all existing [contract-support-cost] funds have already been obligated for existing contracts and compacts. As a result, there are no ISD funds available to fund the Tribes [sic] request for [contract-support-cost] funding associated with the new or expanded [programs, functions, services and activities] being transferred to the Tribe pursuant to this AFA/FA, including any pre-award or start-up costs.
>
> The IHS has informed the Tribe that Congress may not appropriate additional contract support cost funds in future years. The Tribe has informed the IHS that it still wishes to contract for the new or expanded [programs, functions, services and activities] as identified herein, despite the unavailability of [contract support costs] and the possibility that Congress will not appropriate additional [contract-support-cost] funds in future years. The Tribe assures the IHS that it can carry out the new or expanded [programs, functions, services and activities] despite the absence of [contract support costs].
>
> * * *
>
> The parties further agree that if Congress appropriates additional [contract-support-cost] funds, such funds will be distributed in accordance with applicable [agency regulations]. Based upon this understanding, the IHS agrees to transfer the new or expanded [programs, functions, services and activities] identified here in to the Tribe. The parties further agree that nothing in this AFA/FA or the associated contract/compact creates a promise on the part of the IHS to pay the Tribe [contract support costs] for the new or expanded [programs, functions, services and activities] identified herein.

It does not appear from the record that this language was formally published or adopted.

RNSB agreed to include the proposed language if the following two sentences were also included:

> Nothing in this proposal shall be construed as a waiver of rights by RNSB or acquiescence to deviations from the Model Agreement regarding RNSB's rights to [contract-support-cost] funding as necessary and reasonable to carry out the contracted programs. It is RNSB's position that the language was illegally insisted on by IHS as a precondition for awarding a contract.

In a letter dated January 12, 2007, IHS formally declined RNSB's contract proposal, stating that IHS could "no longer contractually obligate itself to pay contract support costs" and that RNSB's proposed language was unacceptable because it did not account for this "fiscal

6

reality."

RNSB requested an informal conference pursuant to 25 C.F.R. §§ 900.153-900.157 to attempt to resolve the declination issues. Christopher Mandregan, Jr., Director of the Alaska Area Native Health Services, conducted the informal conference on February 14, 2007. Following this conference, Mr. Mandregan issued a recommended decision finding that the parties had resolved all declination issues except contract support costs. Mr. Mandregan's recommended decision supported the IHS's decision to decline Plaintiff's contract proposal due to the "failure to negotiate [contract-support-cost] language that acknowledged the Agency's inability to fund [contract support costs] associated with [new contracts]." Mr. Mandregan concluded that IHS could not promise to pay contract support costs when it lacked the funds to do so because "[t]he Anti-Deficiency Act prohibits government officials from incurring obligations in excess of available appropriations," and the Appropriations Clause of the Constitution "prohibits money from being paid out except through appropriations made by Congress."

On March 26, 2007, RNSB filed this action alleging, in part, that IHS's declination of RNSB's proposed contract violates the ISDEAA and seeking injunctive and declaratory relief as well as monetary damages, interest, and attorney's fees and costs. RNSB then filed the instant motion seeking immediate mandatory relief under the ISDEAA and Defendants filed a motion seeking summary judgment on two of RNSB's claims and dismissal of the remaining claims.

## LEGAL STANDARD

### I. Immediate Injunctive Relief Under Section 450m-l(a)

Section 450m-1 of the ISDEAA authorizes district courts to "order appropriate relief" in

7

actions arising under the ISDEAA, "including immediate injunctive relief to reverse a declination finding under section 450f(a)(2) of this title or to compel the Secretary to award and fund an approved self-determination contract." 25 U.S.C. § 450m-l.  In any civil action brought pursuant to 25 U.S.C. § 450m-l(a) challenging the declination of a tribe's contract proposal, the government bears the burden of establishing by clear and convincing evidence the validity of the grounds for declination. 25 U.S.C. § 450f(e)(1).

## II.  Summary Judgment

Summary judgment is an integral part of the Federal Rules of Civil Procedure, which are intended to "secure the just, speedy and inexpensive determination of every action."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).  Under Rule 56(c), summary judgment is appropriate when the court, viewing the record in the light most favorable to the nonmoving party, determines that "there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." *Thrasher v. B & B Chem. Co., Inc.,* 2 F.3d 995, 996 (10th Cir. 1993).

The movant bears the initial burden of showing "there is an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.  Once the movant meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id*. at 324 (quoting Fed. R. Civ. P. 56(e)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citation omitted).

Although the material submitted by the parties in support of and in opposition to the motion must be construed liberally in favor of the party opposing the motion, *Pittsburg & Midway Coal Min. Co. v. Yazzie,* 909 F.2d 1387, 1427 (10th Cir. 1990), the burden on the moving party may be discharged by demonstrating to the court that there is an absence of evidence to support the nonmoving party's case, *Celotex,* 477 U.S. at 325.  In such a situation, the moving party is entitled to judgment as a matter of law "because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 322.

### III. Dismissal for Failure to State a Claim

In considering a Rule 12(b)(6) motion, the court must assume as true all well-pleaded facts, and must draw all reasonable inferences in favor of the plaintiff. *Housing Auth. of the Kaw Tribe v. City of Ponca City*, 952 F.2d 1183, 1187 (10th Cir. 1991).  The issue in reviewing the sufficiency of a complaint is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support his/her claim.  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).  In making this determination, the Court is looking for "plausibility in th[e] complaint." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1970 (2007).

These deferential rules, however, do not allow the court to assume that a plaintiff "can prove facts that [he/she] has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983).  "[G]ranting a motion to dismiss is 'a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice.'"  *Cayman Exploration Corp. v.*

9

*United Gas Pipe Line Co.*, 873 F.2d 1357, 1359 (10th Cir. 1989) (quoting *Morgan v. City of Rawlins*, 792 F.2d 975, 978 (10th Cir. 1986)).

## DISCUSSION

Both Defendants and RNSB's motions primarily raise the legal question of whether the ISDEAA gives the Secretary the discretion to deny a self-determination contract solely on the grounds that insufficient appropriations exist to pay contract support costs. In addition to this statutory argument, Defendants' motion also asserts that the Anti-Deficiency Act and the Appropriations Clause required the denial of RNSB's contract. The arguments in both motions will be considered together.

### I.  ISDEAA Statutory Language

The first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning regarding the particular dispute in the case. The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole. *See K Mart Corp. v. Cartier, Inc*., 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."); *Crandon v. United States*, 494 U.S. 152, 158 (1990) ("In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy" ). The Court's inquiry ceases if the statutory language is unambiguous and "the statutory scheme is coherent and consistent." *United States v. Ron Pair Enterprises, Inc*., 489 U.S. 235, 240 (1989); *see also Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-254 (1992)

The ISDEAA requires the Secretary to approve a proposal and award a contract unless the Secretary demonstrates that at least one of five statutory grounds for declination exists. 25 U.S.C. § 450f(a)(2). In this case, Defendants assert that the fourth ground for declination–that "the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 450j-1(a) of this title"–provides grounds for the declination.

The meaning of "applicable funding level" is defined by cross reference to § 450j-1(a). Section 450j-1(a) states, in relevant part, that "[t]he amount of funds provided under the terms of self-determination contracts . . . shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract" and that "contract support costs shall be added to this amount." 25 U.S.C. § 450j-1(a). The plain language of the statute provides that the applicable funding level for a self-determination contract is the amount the Secretary would have provided plus contract support costs. Consequently, RNSB's proposal, which seeks the amount the Secretary would have provided plus contract support costs, is not in excess of the applicable funding level as determined under § 450j-1(a).

Defendants' argument that the "applicable funding level" is determined by reference to the amount of appropriations available is not supported by the statutory language and framework. While the statute does provide that the provision of funds under a contract is subject to the availability of appropriations, it does not make the approval of a contract conditioned on the availability of funds.

Similarly, RNSB's refusal to include contractual language waiving contract support costs

is not one of the specified declination criteria and cannot be the basis for a contract declination.

## II. Anti-Deficiency Act and the Appropriation Clause

Defendants contend that the Anti-Deficiency Act and the Appropriation Clause of the Constitution required IHS to decline RNSB's proposal because IHS lacked the funds to pay contract support costs for new self-determination contracts in fiscal year 2007.

### A. Appropriations for Contract Support Costs

The parties agree that Congress did not appropriate sufficient money in 2007 to pay contract support costs for any new self-determination contracts. At the time IHS declined RNSB's contract proposal, Congress had not adopted a budget for fiscal year 2007 and IHS was operating under a continuing resolution, which provided that, for the period prior to the adoption of a new budget or the next continuing resolution, IHS would receive a pro-rata share of the funds that it had received in fiscal year 2006, and under the same conditions that were imposed in 2006. In fiscal year 2006, Congress had appropriated $264,730,000 to IHS to pay contract support costs, and instructed IHS to spend no more than that amount to pay these costs. *See* The Department of Interior and Related Agencies Appropriations Act, 2006, Pub. L. No. 109-54 (2005) (stating that an amount "not to exceed" $268,683,000 shall be spent on contract support costs by IHS).[2] On May 25, 2007, more than four months after IHS declined RNSB's contract, Congress appropriated another $5,000,000 for contract support costs.

### B. Anti-Deficiency Act

Defendants argue that because a statutory cap limits the amount of money that IHS can

---

[2] This amount was reduced to $264,730,00 by subsequent rescission acts. *See* Pub. L. No. 109-54, § 439 and Pub. L. No. 109-148, § 3801.

spend on contract support costs and each and every dollar allowed by the statutory cap was committed to fund contract supports costs for existing self-determination contracts, approving RNSB's proposal, which included contract support costs, would violate the Anti-Deficiency Act. The Anti-Deficiency Act bars a federal employee or agency from entering into a contract for future payment of money in advance of, or in excess of, an existing appropriation. 31 U.S.C. § 1341.[3] As discussed above, while the ISDEAA requires the Secretary to approve a self-determination contract unless at least one of five specified grounds for declination exist, it makes the funding of a contract contingent upon available appropriations.[4] Consequently, the Secretary

---

[3] The Anti-Deficiency Act, 31 U.S.C. § 1341, provides:

> (a)(1) An officer or employee of the United States Government or of the District of Columbia government may not-
> (A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation;
> (B) involve either government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law.

[4] Both the statute itself and the model contract language required to be incorporated into all self-determination contracts state that funding is subject to the availability of appropriations. Section 450j-1(b) states:

> Notwithstanding any other provision in this subchapter, the provision of funds under this subchapter is subject to the availability of appropriations and the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this subchapter.

Section § 450j(c) states that "[t]he amounts of [self-determination] contracts shall be subject to the availability of appropriations.").

The model agreement states that:

> Subject to the availability of appropriations, the Secretary shall make available to the Contractor the total amount specified in the annual funding agreement incorporated by reference in subsection (f)(2). Such amount shall not be less than

does not violate the Anti-Deficiency Act by fulfilling his statutory duty to approve a qualifying proposal because the funding of a contract is subject to available appropriations.[5] The Secretary approves qualifying self-determination contracts but Congress determines the amount of appropriated funds the agency may obligate for these self-determination contracts by providing that the amounts of such contracts are "subject to the availability of appropriations" and by placing caps in the BIA's appropriations statutes. Both the Federal and D.C. Circuits, as well as two other courts in this district, have ruled that the ISDEAA and its model contracts do not create an enforceable obligation of the United States for payment of contract support costs in amounts in excess of caps on appropriations.[6] *See Babbitt v. Oglala Sioux Tribal Pub. Safety*

---

the applicable amount determined pursuant to [25 U.S.C. § 450j-1].

25 U.S.C. § 450*l*(c).

[5] Defendants argue that the self-determination contract, even with the explicit subject-to-appropriations language, potentially violates the Appropriations Clause and the Anti-Deficiency Act because there is a possibility that a court could interpret the contract to require IHS to pay contract support costs even in the absence of a sufficient appropriation. And, according to Defendants, "[t]his possibility, however small, pushes the expected cost of the contract past the level that IHS can cover with appropriated funds." Defendants' speculative argument, which conceivably could apply to every government contract, is entirely unpersuasive. As stated by another judge in this district in response to the same argument in an identical case brought by the Southern Ute Indian Tribe, "[t]he Government cannot speculate that the Supreme Court will require it to pay obligations for which there are no unrestricted funds available and engage in self-help statutory amendment to avoid the anticipated result of such a decision." *Southern Ute Indian Tribe v. Leavitt*, 497 F.Supp.2d 1245, 1256 (D.N.M. 2007).

[6] In *Cherokee Nation v. Leavitt*, 543 U.S. 631 (2005), the Government refused to pay the full amount of contract support costs under self-determination contracts because Congress had not appropriated sufficient funds. Indian tribes sued under the ISDEAA seeking to recover full contract support costs. The Government argued that it was not obligated to pay the full contract support costs if Congress had not appropriated sufficient funds specifically to pay these costs. The Supreme Court held that, where Congress had appropriated sufficient legally *unrestricted* funds to pay contracts in question, government could not avoid its contractual obligation to pay contract support costs on grounds of "insufficient appropriations." This case differs from *Cherokee Nation*, however, because for the fiscal year at issue here, Congress did not simply fail

*Dep't*, 194 F.3d 1374 (Fed. Cir. 1999) (holding that tribe was not entitled to full contract costs because the ISDEAA explicitly makes the funding of contract costs subject to the availability of appropriations and Congress had set an express cap on funds for contract costs below the amount needed to fully pay costs); *Ramah Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1341-42 (D.C. Cir. 1996) (finding that under the clear statutory language of the ISDEAA, the payment of contract costs is subject to the availability of funding so, if Congress puts a cap on the appropriation amount available for contract support costs, the Secretary need only distribute the amount of money appropriated by Congress); *Southern Ute Indian Tribe v. Leavitt*, 497 F.Supp.2d 1245 (D.N.M. 2007) (holding that the Secretary did not have discretion to decline to enter into an ISDEAA contract on the grounds that insufficient funds existed to pay full contract costs; did not have discretion to condition approval of Plaintiff's proposal on new contract language contradicting the statutory model language or on Plaintiff's waiver of funding specifically provided under the ISDEAA; and that entry into an ISDEAA contract under these circumstances did not violate the Appropriations Clause of the Constitution or the Anti-Deficiency Act); *Ramah Navajo Chapter, et al. v. Norton*, 90cv957 LH/WWD (D.N.M. August 31, 2006) (concluding that under the ISDEAA, the "United States is not liable for shortfalls in contract payments when Congress has specified an insufficient 'not to exceed' lump sum appropriation.").

---

to earmark sufficient funds for contract support costs; rather, Congress placed a statutory cap on the amount the Secretary was authorized to spend on contract support costs. The Court in *Cherokee Nation* did not address the issue of what the Government's obligations to pay contract support costs would be if Congress explicitly prohibited the use of unrestricted funds to pay contract support costs. In its opinion, however, the Court repeatedly made reference to the lack of legally binding restrictions in the IHS lump sum appropriations at issue.

### C. Appropriations Clause

Defendants' argument that approval of RNSB's self-determination contract would violate the Appropriations Clause is equally unpersuasive. One of the fundamental powers lodged by the Constitution in the Congress is control over the expenditure of public money. The Appropriations Clause provides:

> No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time.

U.S. Const. Art. I, § 9, Cl. 7. The fundamental purpose of the Appropriations Clause "is to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." *Office of Personnel Management v. Richmond*, 496 U.S. 414, 428 (1990). Placing the authority to dispose of public funds in the hands of Congress, rather than the Executive, gives the Legislative Branch a powerful tool to curb behavior by the Executive. *American Federation of Government Employees, AFL-CIO, American Federation of Government Employees, AFL-CIO, Local 1647 v. Federal Labor Relations Authority*, 388 F.3d 405, 408-9 (3rd Cir. 2004).

As discussed above, under the ISDEAA, the approval and funding of self-determination contracts are separate. The Secretary is tasked with approving qualifying contracts while Congress determines the funding level for these contracts through its yearly appropriations. Consequently, the Secretary's approval of self-determination contracts does not violate the Appropriations Clause because Congress, not the Secretary, determines the level of funding for approved contracts. Under the ISDEAA, no money is paid out of the Treasury absent an

appropriation by Congress and, consequently, there is no violation of the Appropriations Clause. *See Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) ("Money may be paid out [of the Federal Treasury] only through an appropriation made by law.").

### III. Proposed Waiver of Contract Support Costs Violates ISDEAA and APA

In Counts III and IV of its Complaint, RNSB alleges that Defendants' adoption of a new mandatory rule requiring a waiver of all rights to contract support costs violated the ISDEAA and the Administrative Procedures Act, 5. U.S.C. § 533. In their motion, Defendants seek to dismiss these counts on the grounds that IHS did not improperly promulgate any regulations pertaining to self-determination contracts, but rather complied with the law established by the Anti-Deficiency Act and the Appropriations Clause. As discussed above, the language required by IHS was not necessary to comply with the Anti-Deficiency Act and the Appropriations Clause because the model agreement included language limiting funding under the contract to available appropriations. Consequently, the Court will deny Defendants' motion to dismiss these claims pursuant to Rule 12(b)(6).

### CONCLUSION

In sum, the ISDEAA required the Secretary to approve RNSB's self-determination contract because none of the specified statutory grounds for declination existed. The Secretary did not have discretion to decline RNSB's proposal on the basis of insufficient Congressional appropriations to pay contract support costs or on RNSB's refusal to include contractual language waiving contract support costs. Furthermore, the Secretary's approval of a self-determination contract does not violate the Anti-Deficiency Act or the Appropriations Clause because the provision of funds under a self-determination contract is subject to the availability of

appropriations.  Consequently, Defendants' motion for summary judgment and to dismiss will be denied and RNSB's motion seeking immediate injunctive relief to reverse the Secretary's declination finding will be granted.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment and to Dismiss, filed June 11, 2007, **[Doc. No. 17]**, is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Immediate Mandatory Relief, filed May 17, 2007, **[Doc. No. 10]** is **GRANTED in part**.  Plaintiff is entitled to injunctive relief on its first cause of action in accordance with 25 U.S.C. § 440m-l(a).  Plaintiff is directed to prepare a form of order requiring Defendants to reverse their declination of Plaintiff's proposed self-determination contract, submit the order to Defendants for approval as to form, and then submit the order to the Court.  If the parties are unable to reach agreement as to the form of an order, Plaintiff shall file a motion for a presentment hearing.

**IT IS FURTHER ORDERED** that Plaintiff's Amended Emergency Motion to Preserve Funds, filed October 31, 2007, [Doc. No. 39] is **DENIED as moot**.

**IT IS FINALLY ORDERED** that the parties schedule a status conference with the magistrate judge assigned to this case to establish a schedule and procedure to resolve Plaintiff's remaining claims.

Dated this 6th day of February, 2008.

_____
MARTHA VÁZQUEZ
U. S. DISTRICT COURT JUDGE

Attorney for Plaintiff:
    Michael P. Gross, Esq.
Attorney for Defendants:
    Jan Elizabeth Mitchell, Esq.
    Justin Sandberg, Esq.