**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**RAMAH NAVAJO SCHOOL BOARD, INC.**

    **Plaintiff,**       **No. CIV-07-0289 MV/ACT**

**v.**

**KATHLEEN SEBELIUS, Secretary of
the United States Department of Health and
Human Services, et al.,**

    **Defendants.**

**MAGISTRATE JUDGES'S PROPOSED FINDINGS AND
RECOMMENDED DISPOSITION**

   THIS MATTER comes before the Court on the Honorable Chief Judge Martha

Vazquez's Order of Reference filed on May 19, 2010, pursuant to the provisions of 28 U.S.C. §§

636(b)(1)(B) & (b)(3). [Doc. 72.] Chief Judge Vazquez referred this matter to the undersigned

Magistrate Judge "to determine whether and to what extent damages are appropriate in this case"

and to "recommend a disposition as to damages" for the period between January 12, 2007 (the

date that Defendants sent Ramah Navajo School Board, Inc., a letter declining its contract

proposal [Doc. 1 at ¶ 26]) and February 6, 2008 (the date that Chief Judge Vazquez filed her

Memorandum Opinion and Order), as well as for the period from February 6, 2008 to the

present. [*Id.* at 1 and 3.]  Having considered the pleadings, the submissions of the parties, the

relevant law, the testimony and the evidence, the undersigned Magistrate Judge recommends that

no damages be awarded.

Procedural Background.

1.   This action commenced on March 3, 2007, when Plaintiff Ramah Navajo School Board, Inc. ("RNSB" or "Plaintiff") challenged the Defendants' denial of RNSB's self-determination contract proposal under the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 450 *et seq.* ("ISDA"). [Doc. 47 at 1.]

2.   On October 23, 2007,  Plaintiff filed an Emergency Motion to Preserve Funds by requiring the Secretary of the Health and Human Services to "pay into the Registry of this Court $348,653 from fiscal year 2007 funds appropriated to the Indian Health Services. . . and further instructing Defendants not to obligate the $348,653 to any other entity pending their deposit with the Clerk of the Court." [Doc. 34.]

3.   On February 6, 2008, Chief Judge Vazquez entered a Memorandum Opinion and Order wherein she determined that the ISDA "required" that the Secretary approve RNSB's proposed self-determination contract "because none of the specified statutory grounds for declination existed." [Doc. 47 at p. 17.] The Court specifically found that

> [t]he Secretary did not have discretion to decline RNSB's proposal on the basis of insufficient Congressional appropriation to pay contract support costs or on RNSB's refusal to include contractual language waiving contract support costs.

[*Id.* at p. 17.]

4.   Chief Judge Vazquez ordered that RNSB "was entitled to injunctive relief on its first cause of action in accordance with 25 U.S.C. § 440m-l(a)." [Doc. 47 at 18.] She also ordered that Plaintiff's Emergency Motion to Preserve Funds would be denied as moot.  RNSB was directed to submit a form of order which required Defendants to reverse their declination of RNSB's proposed self-determination contract.  Chief Judge Vazquez further ordered that if the parties were unable to reach an agreement, Plaintiff was to file a motion for a presentment hearing. [*Id.*]

2

5.   On February 22, 2008, Plaintiff filed its first Motion for Presentment Hearing [Doc. 50.] Plaintiff's proposed order included that Chief Judge Vazquez order the Defendants reverse their declination of  RNSB's proposed self-determination contract.  It also included a proposed provision ordering Defendants to pay Plaintiff the amount of program funds that Plaintiff had sought in its proposed self-determination contract for the fiscal year ("FY") 2007, specifically, "$357,656.00 as direct program funds constituting the tribal shares at issue in this litigation." [Doc. 50.] Plaintiff did not request contract support costs (sometimes referred to herein as "CSC") for FY 2007. [*Id.*]

6.   On August 5, 2008, Chief Judge Vazquez granted Plaintiff's Motion for Presentment Hearing and ordered that a hearing be held on September 25, 2008. [Doc. 54.]

7.   On September 10, 2008, Plaintiff filed a Notice of Revised Proposed Order. [Doc. 56.] The revision to the Proposed Order amounted to a request for an order mandating payment for FY 2008 tribal shares funding in addition to the FY 2007 tribal shares funding that Plaintiff had initially requested.  Plaintiff proposed that the Court order that Defendants pay them $357,656.00 for FY 2007 and $357,656.00 for FY 2008 as direct program funds constituting the tribal shares at issue in this litigation. [Doc. 56.]  Plaintiff did not request CSC for FY 2008. [*Id.*]

8.   On September 19, 2008, Chief Judge Vazquez vacated the presentment hearing scheduled for September 25, 2008, and ordered Defendants to file objections to Plaintiff's Proposed Order and permitted Plaintiff a chance to respond to the objections within ten days of its filing. [Doc. 57.]

9.   On October 3, 2008, Plaintiff filed a Notice of Completion of Briefing on the Proposed Presentment Order. [Doc. 60.]

10.  On July 22, 2009, Plaintiff filed a Second Revised Proposed Order requesting that

the Court's order require payment of the FY 2009 tribal share funds as well as the tribal share

funds for FY 2007 and FY 2008. [Doc. 63.]  RNSB stated that it believed "a hearing would be of

assistance to the Court in understanding the positions of the parties on this issue and in moving

this litigation toward resolution" and advised the Court the hearing should not take more that

fifteen minutes and could be done telephonically. [*Id.*]  Plaintiff did not request CSC for FY

2009. [*Id.*]

     11.  On September 2, 2009, Chief Judge Vazquez ordered that Plaintiff file a notice

"describing its position" on their Second Revised Proposed Order, and that Defendants then be

allowed to file a response to Plaintiff's notice. [Doc. 66.]

     12.  On September 30, 2009, Defendants filed their response, thus completing the

briefing on the Second Revised Proposed Order as ordered by Chief Judge Vazquez. [Doc. 70.]

     13.  On May 19, 2010, Chief Judge Vazquez referred the case to the undersigned

Magistrate Judge to "conduct a hearing, including an evidentiary hearing if warranted, and to

perform any legal analysis required to recommend to the Court whether and to what extent

damages should be awarded" within ninety (90) days of the Order. [Doc. 72.]

     14.  The undersigned Magistrate Judge set a hearing for July 21, 2010, and allowed each

party to submit memoranda outlining their position. [Doc. 74.] Both parties filed trial briefs.

[Doc. 75 and Doc. 76.]

     15.  On July 21, 2010, the undersigned Magistrate Judge held an evidentiary hearing,

took witness testimony, and considered the evidence in this case. [Doc. 77.]

     16.  The undersigned Magistrate Judge allowed each party to file a final brief in the form

of Proposed Findings of Fact and Conclusions of Law and ordered the briefs filed by August 6,

2010. [Doc. 77.] Both parties filed Proposed Findings of Fact and Conclusions of Law. [Doc. 78

and Doc. 79.]

<u>Self-Determination Contracts</u>.

17.  The federal government, through Indian Health Services ("IHS"), provides health services to American Indians throughout the United States.

18.  In 1975, Congress passed the ISDA, 25 U.S.C. § 450 *et seq.*, which established a system by which tribes can enter into contracts with the federal government to furnish services that are otherwise supplied by IHS.  Under the ISDA, tribes can contract to assume responsibility for any of the programs, functions, services, or activities ("PFSAs") provided by the IHS.  25 U.S.C. § 450(f).  The PFSAs not assumed by a tribe under a self-determination contract remain the responsibility of the IHS.  25 U.S.C. § 450*l* (c) (Model Agreement § 1(d)(3)).  *See also* Doc. 77 at 131-32, 138 and 142 (testimony of Ms. Jean Othole).

19.   The ISDA is a comprehensive scheme designed to establish "a meaningful Indian self-determination policy, which will permit an orderly transition from the Federal domination of programs for, and service to, Indians to effective [sic] and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services."  25 U.S.C. § 450a.

20.  Pursuant to the ISDA, self-determination contracts are employed to effectuate the transition of control of services from the federal government to the tribal governments. 25 U.S.C. § 450(f).

21.  The ISDA authorizes a tribe to receive the full amount of funding the Secretary would have otherwise expended "for the operation of the programs or portion thereof" associated with the PFSAs that would be transferred to a tribe through its contract and Annual Funding Agreement ("AFA").  25 U.S.C. § 450j-l(a).  This amount is known as the tribe's "tribal share

amount" and forms the direct program funding of a self-determination contract. [Doc. 77 at p. 125 (testimony of Ms. Othole).]

22.  In addition to direct program funding, the Secretary provides contract support costs for the self-determination contracts. 25 U.S.C. § 450j-1(a)(2).  These contract support costs are subject to availability of appropriations.  25 U.S.C. § 450l(c)(Model Agreement § (b)(4)).

23.  A "self-determination contract" is defined in the ISDA as "a contract . . . entered into under part A of this subchapter between a tribal organization and the [federal government] for the planning, conduct, and administration of services which are otherwise provided to Indian tribes and their members pursuant to Federal law."   25 U.S.C. § 450b(j).

24.  The ISDA provides great detail concerning the creation and administration of self-determination contracts, including, but not limited to, when the contracts can be entered into or when they may be declined, 25 U.S.C. § 450f; whether federal contracting law applies, 25 U.S.C. § 450j; how the contracts are to be funded, 25 U.S.C. § 450j-1; the specific terms that must be included in the contracts, 25 U.S.C. § 450l; and when the contracts can be rescinded, 25 U.S.C. § 450m.

25.  The ISDA includes a remedial provision entitled "Contract disputes and claims" which provides as set forth below.

> The United States district courts shall have original jurisdiction over any civil action or claim against the appropriate Secretary arising under this subchapter and, subject to the provisions of subsection (d) of this section and concurrent with the United States Court of Claims, over any civil action or claim against the Secretary for money damages arising under contracts authorized by this subchapter.  In an action brought under this paragraph, the district courts may order appropriate relief including money damages, injunctive relief against any action by an officer of the United States or any agency thereof contrary to this subchapter or regulations promulgated thereunder, or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under this subchapter or regulations promulgated hereunder (including immediate injunctive relief to reverse a declination finding under section 450(a)(2) of

this title or compel the Secretary to award and fund an approved self-determination contract).

25 U.S.C. § 450m-1(a).

Tribal Shares.

26.   In the late 1970's the IHS and RNSB entered into a contract and AFA providing RNSB with a portion of its tribal share funds associated with specific PFSAs administered for the benefit of the RNSB by the IHS.  RNSB did not contract for 100% of its tribal shares at that time. [Doc. 77 at 128-129 (testimony of Jean Othole) and at 60-61, 110-112 (testimony of Carolyn Finster).]

27.  RNSB has used the tribal shares that it contracted for in the 1970's, in addition to other third-party funds, to run the Pine Hill Health Center Clinic ("Pine Hill Clinic"). [Doc. 77 at 60-62, 110-112 (testimony of Ms. Finster).] The RNSB's third-party funds constitute approximately 60% of the Pine Hill Clinic budget. [*Id.* at 62.]

28.   IHS retained responsibility for the remaining portion of the PFSAs that were not assumed by RNSB, as well as any tribal shares not contracted for by Zuni tribal members, and thus retained the associated funding to carry out the retained responsibilities.  IHS used this funding to provide in-patient and out-patient health care services to the patient population of the Zuni-Ramah Service Unit ("ZRSU") which is comprised primarily of Zuni and Ramah Navajo tribal members.  IHS continues to provide these services to the ZRSU. [Doc. 77 at 129-132, 138-142, 147, 187 (testimony of Jean Othole).]

29.  The IHS has the right to use the funding that was not contracted to the RNSB or the Zuni however it deems best to meet the needs of the people that it is providing services for, in this case the patient population of ZRSU.  25 U.S.C. § 450*l* (c) (Model Agreement § 1(d)(3)).

7

[Doc. 77 at 125-126, 167-168 (testimony of Jean Othole).]

    30.  In October of 2006 RNSB sought to assume responsibility for the remaining PFSAs and associated funding for dental health, mental health, public health nursing and health education programs it had partially assumed in the 1970's.  Plaintiff submitted a proposed self-determination contract to IHS for these tribal shares which was to take effect in 2007 (referred to hereafter as Plaintiff's "2007 proposed self-determination contract" or "proposed self-determination contract"). [Doc.10-9.] ( The IHS declined the proposed contract which led to this lawsuit and the current issue before the undersigned Magistrate Judge, as discussed above under "Procedural History.")

    31.  No contract with respect to Plaintiff's proposed 2007 self-determination contract has been entered into as of this date and IHS has continued to use the funds which are the subject of the proposed self-determination contract to provide services directly to the patient population of ZRSU. [Doc. 77 at 129, 131-132, 139-141, 143, 148-149 (testimony of Jean Othole).]

    32.  IHS has been providing to Plaintiff, on a non-recurring basis, all the tribal shares associated with heath education.  It has been doing so by adding in this money to Plaintiff's AFA in 2007, 2008 and 2009 after receiving a letter request from Plaintiff to do so.  This was done because the Zuni Tribe contracted for its health education tribal shares, leaving a balance too small for IHS to staff a health education program with the remainder of funds left for the Area Office, and because IHS was at risk of losing the money back to Treasury if it did not use the money before the end of the fiscal year. [Doc. 77 at 148-149, 153-154 (testimony of Ms. Othole).]

    33.  Defendants acknowledge that it is not proper procedure for IHS to modify a self-determination contract simply by adding in tribal shares to an AFA. [Doc. 77 at 149-150

(testimony of Ms. Othole).] A tribe must submit a contract proposal to take over the additional PFSAs. [*Id.* at 152-153.] *See also* 25 C.F.R. § 900.32.

34.   The parties have not entered into the 2007 proposed self-determination contract because of unresolved issues about whether Plaintiff should be paid "damages" in the dollar amount of tribal shares Plaintiff would have received had its proposed self-determination contract been accepted and implemented in 2007, 2008, 2009 and 2010.  Plaintiff, in its form orders presented to the Court, has not requested contract support costs for any of the years at issue in this lawsuit. [Doc. 50-1, Doc. 56-1, and Doc. 63-1.]

35.   Ramah Navajos continue to receive the benefits of their tribal shares which are the subject of the proposed 2007 self-determination contract through the ZRSU administered by the IHS.  When RNSB contracts for its remaining tribal shares these funds will no longer be available for use by the IHS.

Remedial Provisions of ISDA.

36.   Plaintiff seeks relief pursuant to the remedial provision of ISDA. 25 U.S.C. § 450m-1(a).

37.   Defendants interpret the remedial provision of the ISDA, 25 U.S.C. § 450m-1(a), as giving the United States District Court jurisdiction over civil actions against the appropriate Secretary for money damages arising under contracts. (Emphasis added.) *Id.*  Defendants rely on *Samish Indian Nation v. United States*, 419 F.3d 1355, 1365 (Fed. Cir. 2005)("Absent a contract the ISDA does not confer a private damage remedy.").[1]  Defendants maintain that the United

---

[1] The Court notes that the court in *Samish Indian Nation v. United States*, 419 F.3d 1355, 1365 (Fed.Cir. 2005) limited its holding to the facts of that case.  It stated, "the ISDA does not reveal congressional intent to provide the damage remedy the Samish have claimed in this action." *Id.* at 1365.  In *Samish,* the tribe sought damages in the form of tribal shares for the

States courts only have the authority to order money damages arising under contracts, but can also order injunctive relief or mandamus to compel a duty which can include ordering immediate injunctive relief to reverse a declination finding under section 450(a)(2) of this title *or* to compel the Secretary to award and fund a contract.

38.   The Plaintiff interprets the statute as providing the federal courts with the authority to award "money damages" in any civil action or claim arising under the ISDA.  It asserts it has been damaged by having to spend its own third-party revenues to help fund the Pine Hill Clinic and that these third-party funds could have been used for other purposes had it received the tribal shares it properly requested.

39.   The ISDA authorizes self-determination contracts "to supply federally funded services, for example tribal health services [like in the present case] that a Government agency would otherwise provide."  *Cherokee Nation of Oklahoma v. Leavitt*, 543 U.S. 631, 634 (2005). "The objective in interpreting the ISDA is to give effect to congressional intent."  *Samish Indian Nation v. United States*, 419 F.3d at 1365.  "It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."  *TRY Inc. v. Andrews*, 534 U.S. 19, 31 (2001)(internal quotation and citation omitted).

40.   The undersigned Magistrate Judge finds that under the circumstances of this case, 25 U.S.C. § 450m-1(a) does not provide for a damage remedy because no contract exists, and equity would not permit recovery because Plaintiff has already received the benefits of the money it seeks as damages.

years it was not allowed to submit proposed self-determination contracts because the federal government had not recognized them as a tribe.

41.   There is no controlling precedent indicating how and when damages are to be awarded after a district court finds that the IHS wrongfully, but timely, declined a tribe's proposed self-determination contract, ordered that the declination be reversed but not that the contract be funded or entered into on a date certain, and the tribal shares at issue were not preserved.[2]

42.   The present case is distinguishable from *Cheyenne River Sioux Tribe v. Kempthorne*, 496 F. Supp. 2d 1059 (2007).  There the court found that the federal agency waived its rights by failing to follow proper declination regulations, and the proposed self-determination contract was deemed approved within 90 days of its submission.  In addition, the tribe had filed a motion for preliminary injunction to prohibit the defendant from spending any of the unpaid funds from FY 06-07 until the final disposition of the litigation, as well as a motion for writ of mandamus requesting that the court exercise its equitable powers to award and fully fund the plaintiff's successor AFA for FY 2008. The court ordered that the contracts had been funded as of 2006 and ordered payment.

43.   Similarly, in *Crownpoint Institute of Technology v. Norton*, No. 04-CV-531 (D.N.M. Sept. 16, 2005), the Honorable James A. Parker found that the defendants failed to meet their duty to act within the required 90 days after receipt of a self-determination contract proposal.  He held that the contract proposals were therefore "deemed approved."  He further ordered that the tribe's motion for writ of mandamus asking that the court order the defendants to award the contracts, along with the contract support costs, be granted and that the contracts for the previous

---

[2] The undersigned Magistrate Judge notes that Chief Judge Vazquez denied as moot Plaintiff's Emergency Motion to Preserve Funds and did not order that the parties enter into a contract by a date certain. [Doc. 47.]

fiscal years be funded. *Id.* at 25-26.

44.  A recent case decided by the Honorable William P. Johnson is instructive, but distinguishable, on the issue of awarding past tribal shares as damages in a case similar to this one.  In *Southern Ute Indian Tribe v. Leavitt*, No. 09-CV-988 WJ/LAM, Oct.18, 2007, defendants timely declined a proposed self-determination contract submitted by the Southern Ute Tribe.  Judge Johnson found that defendants had wrongfully declined to enter into a self-determination contract with the Southern Ute Tribe "to assume control over and management of the programs, functions, services and activities of the Southern Ute Health Center" and ordered injunctive relief and for the parties to present a form of order to the Court.  *Id.* at 1-2.  Like the present case, the parties could not agree to a  "starting date" of the contract, among other matters, from which the Tribe claimed amounts due based on tribal shares.  Judge Johnson aptly noted that the ISDA "offers no guidance on appropriate beginning dates for declined contracts which are reversed on appeal," (*Id.* at 3) but  "the sole purpose in imposing a start date. . . [is] to preserve Plaintiff's ability to continue to allege damages." *Id.* at 5.

45.  Judge Johnson ordered a "start date" of the contract to be the date when the Southern Ute assumed control of the Southern Ute Health Care Center.  The Court stated that in contrast to the situation in other cases,  "the [Southern Ute] Tribe has not been operating the clinic," and "there had not been partial approval of portions of the contract such that the agency would have already been obligated to provide[ ] CSC funding for the proposed contract."  *Id.* at 5-6.

46.  Judge Johnson compared the Southern Ute situation with two other cases: *Pascua Yaqui Tribe of Arizona*, Docket No. A-99-20 (HHS Appeals Bd. Jan. 12, 1999) and *Crown point Institute of Technology v. Norton*, Civil No. 04-531 JP/DJS (D.N.M. Sept.19, 2005).  Judge Johnson found that these two cases involved "contracts or programs which had already been

partially approved, or had been operating under other funds." *Southern Ute* at p. 4. In *Pascua,* a portion of the proposed contract had been approved. In *Crown point*, the education program at issue had been running under grant funds, thereby forcing the tribe to incur the costs and expenses of running the program. *Id.*

47. Here, the RNSB has been operating the Pine Hill Clinic with funds from its previously contracted tribal shares for dental health, mental health, public health nursing and health education programs as well as with its own third-party revenues. The third-party funds constitute approximately 60% of the Pine Hill Clinic's budget.

48. Plaintiff claims that it was damaged because, had it received the tribal shares that it requested in its proposed 2007 self-determination contract (which was wrongly declined), it would have used its "third-party revenues" for other needs of the Ramah Navajo.

49. Plaintiff introduced no evidence, testimony or documents, other than speculation on how it would have spent these third-party funds had it received the tribal shares requested in proposed 2007 self-determination contract. Ms. Finster testified only that RNSB "probably would move forward with some of the items on [their]. . . capital equipment list." [Doc. 77 at 63-64.]

50. Another area of "damages" that might be supported by the remedial provision of the ISDA (25 U.S.C. 450m-1-(a)) is if Plaintiff could show that members of the Ramah Navajo Nation did not receive health care as a result of the wrongful declination of the proposed self-determination contract.

51. Plaintiff presented no evidence that anyone from the Ramah Navajo Nation did not receive health care services under the dental health, public health, public health nursing or health education programs covered by their proposed self-determination contract. At best, Plaintiff

presented evidence that had their proposed self-determination contract been entered into, the services would have been provided in the location preferred by Plaintiff.

52. Plaintiff's argument that it is entitled to "damages" as an equitable matter also fails. It is not entitled to money damages in the amount of its tribal shares at issue from FY 2007 to the present as an equitable matter because such an award would constitute a windfall for the Plaintiff since it has already received services from IHS which were funded by the tribal shares money RNSB now seeks.  It is not equitable for Plaintiff to receive services from IHS and also recover the money for tribal shares it would have received had it entered into a self-determination contract in 2007 and provided those services itself.  *See Rosario-Torres v. Hernandez-Colon*, 889 F.2d 314, 321 (1st Cir.1989) (en banc)("[T]he hallmark of equity is the ability to assess all relevant facts and circumstances and tailor appropriate relief on a case by case basis.").

53. Based on the procedural posture of this case, including the lack of evidence supporting actual money damages, the undersigned Magistrate Judge will recommend that damages based on the tribal shares associated with the Plaintiff's proposed 2007 self-determination contract should not be awarded pursuant to 25 U.S.C. § 450m-1.

Contract Support Costs.

54. Chief Judge Vazquez held that insufficient funds for CSC is not a reason to decline the contract proposal. [Doc. 47.]

55. CSC is, however,  a negotiated term that must be included in the RNSB proposed self-determination contract.  The Model Agreement language included in the ISDA requires that

> [t]he annual funding agreement under this Contract shall only contain. . . terms that identify the programs, services, functions, and activities to be performed or administered, the general budget category assigned, the funds to be provided, and the time and method of payment.

14

25 U.S.C. § 459*l*(c)(Model Agreement § (f)(2)(A)(I). The annual funding agreement is

"incorporated in its entirety" and must be attached to the proposed self-determination contract.

25 U.S.C. 450*l*(c)(Model Agreement § (f)(2)(B)). The Model Agreement also states

> Subject to the availability of appropriations, the Secretary shall make available to the Contractor the total amount specified in the annual funding agreement incorporated by reference in subsection (f)(2). Such amount shall not be less than the applicable amount determined pursuant to [25 U.S.C. § 450j-1].

25 U.S.C. 450*l*(c)(Model Agreement § (f)(2)(B)). "Sections 450j-l(a)(1) and (a)(2) describe,

respectively, the amount of funds which should be provided for the operational expenses and

contract support costs." *Southern Ute Indian Tribe v. Leavitt*, No. 09-CV-988, Oct.18, 2007,

Mem. Op. at p. 6-7.

56. Here, as in *Southern Ute Indian Tribe*, *supra*, the "Plaintiff should have no objection

to the inclusion of terms in the annual funding agreement which reflect the practical

ramifications of the current statutory cap on available appropriations." *Id.* at 8-9.

57. While the District Court has held that insufficient funds for CSC is not a reason to

decline a contract proposal, the issue remains as to the specific terms to be negotiated. The AFA

provisions for CSC should be drafted in a way that comports with the reality of the funding

available. The case of *Southern Ute*, No. 09-CV-988, Oct. 18, 2007, Mem. Op. at 8-9 is

instructive on this point:

> There is common sense to Defendant's position that, if Plaintiff acknowledges that IHS's contractual obligation to pay contract support costs is unforeseeable (based on the Model Contract's "subject to availability of appropriations" language), then plaintiff's refusal to waive immediate payment of CSC is illogical. Plaintiff should have no objection to the inclusion of terms in the annual funding agreement which reflect the practical ramifications of the current statutory cap on available appropriations. On the other hand, if such language is omitted, it is abundantly clear that the Government will be forced to enter a contract which it must breach up front.

58. Plaintiff, in its form orders presented to the Court, did not request contract support

costs for any of the years at issue in this lawsuit. [*See* Doc. 50-1, Doc. 56-1, Doc. 63-1.]

59.  Based upon the statute, including the Model Agreement language included at 25 U.S.C. § 450*l*(c)m, any provision for CSC should be for $0 and further provide that Plaintiff would be placed on the Defendants' "shortfall list" and CSC amount would be paid if and when funds become available.

## RECOMMENDED DISPOSITION

For the reasons stated above the undersigned Magistrate Judge recommends as set forth below.

1.  That the Court deny Plaintiff's request for money damages based on the amount of tribal shares they would have received for FY 2007-2010 had the proposed self-determination contract been executed at any time since the Defendants wrongfully declined the proposed self-determination contract or since Chief Judge Vazquez's Order dated February 6, 2008.

2.  That the Court not award Plaintiff any contract support costs from 2008 to date.

3.  That the Court direct the parties to enter into a self-determination contract by a date certain, to be effective at the beginning of FY 2011.  The CSC amount will be limited in accordance with congressional appropriations for CSC and with IHS policy, which provides that, when CSC funding is not available for a new contract, the tribe's reported CSC need for the new PFSAs will be included in the tribe's shortfall, which is used to determine its allocation of any future increase in CSC funds.

Timely objections to the foregoing may be made pursuant to 28 U.S.C. § 636(b)(1)(c). Within fourteen days after a party is served with a copy of these proposed findings and recommendations that party may, pursuant to § 636(b)(1)(c), file written objections to such proposed findings and recommendations with the Clerk of the United State District Court, 333

16

Lomas N.W., Albuquerque, NM 87102.  A party must file any objections within the fourteen day period allowed if that party wants to have appellate review of the proposed findings and recommendations.  If no objections are filed, no appellate review will be allowed.

ALAN C. TORGERSON
UNITED STATES MAGISTRATE JUDGE