IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

RAMAH NAVAJO SCHOOL BOARD,
INC.,

   Plaintiff,

vs.           No. 07 CV 0289 MV

KATHLEEN SEBELIUS, Secretary of
the U.S. Department of Health and Human
Services, et al.,

   Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court following a three-day evidentiary hearing on the

issue of damages.  The Court finds that Plaintiff Ramah Navajo School Board, Inc. is entitled to

both tangible and intangible damages as a result of Defendants' wrongful declination of

Plaintiff's contract proposal and their ensuing failure to follow the Court's February 6, 2008

order.  Defendants are hereby ordered to pay damages to Plaintiff as set forth herein.

### PROCEDURAL HISTORY

On March 26, 2007, Plaintiff Ramah Navajo School Board, Inc. ("Plaintiff" or "RNSB")

commenced this action against the secretary of the Department of Health and Human Services,

the national and local directors of the Indian Health Service ("IHS"), and the United States

(collectively, "Defendants").  In its complaint, RNSB alleged that Defendants violated the Indian

Self-Determination and Education Assistance Act, 25 U.S.C. § 450 *et seq*. ("ISDA") when they

declined RNSB's October 17, 2006 proposal for a self-determination contract.

On May 17, 2007, RNSB moved for a permanent injunction, requesting, *inter alia*, that

the Court order Defendants to reverse their declination of RNSB's contract proposal and

immediately fund the requested contract.  On February 6, 2008, the Court granted Plaintiff's

motion for injunctive relief in part.  In its Memorandum Opinion and Order, the Court found as

follows: (1) Defendants' refusal to enter into a self-determination contract unless Plaintiff agreed

to specific language governing contract support costs amounted to a violation of the ISDA and

the Administrative Procedure Act; (2) under the ISDA, Defendants did not have discretion to

decline Plaintiff's proposal for a self-determination contract because none of the specified

statutory grounds for declination existed; and (3) Plaintiff was entitled to injunctive relief on its

first cause of action in accordance with 25 U.S.C. § 450m-1(a).  Doc. 47 at 17-18.

Also in its February 6, 2008 Memorandum Opinion and Order, the Court ordered

Plaintiff to prepare a form order requiring Defendants to reverse their declination of Plaintiff's

proposed contract, submit the proposed order to Defendants for their approval, and then submit

the order to the Court.  The parties failed to reach an agreement as to the form and content of the

proposed order, and on May 19, 2010, the Court referred this matter to Magistrate Judge Alan

Torgerson to hold a hearing as to damages.

Judge Torgerson held a hearing on July 21, 2010.  On August 17, 2010, he issued his

Proposed Findings and Recommended Disposition (Doc. 82), ultimately recommending that no

damages be awarded.  He found that the ISDA did not provide for a damage remedy in the

absence of a contract, and he further concluded that Plaintiff was not entitled to damages as an

equitable matter because to award Plaintiff damages for services already provided by IHS would constitute a windfall.

On September 28, 2011, the Court issued a Memorandum Opinion and Order in which it declined to adopt the Magistrate Judge's proposed findings.  It found that IHS's wrongful declination of Plaintiff's contract proposal entitled Plaintiff to compensation, but the Court had insufficient evidence to determine the amount of such compensation.  Accordingly, the Court set the matter for an evidentiary hearing, which it held on June 25 through 27, 2012.  This Memorandum Opinion and Order sets forth the analysis and reasoning supporting the Court's decision regarding damages.

**BACKGROUND TO EVIDENTIARY HEARING**

**I.     The ISDA**

The concept of Indian self-determination is premised on the principle that Indian tribes should be "the primary governmental unit of Indian policy."  FELIX S. COHEN, COHEN'S HANDBOOK OF FEDERAL INDIAN LAW 98 (Nell Jessop Newton et al., eds., 2005 ed.).  In 1975, Congress enacted the Indian Self-Determination Act to "give substance and credibility to the concept of Indian self-determination," which it acknowledged previous legislation had failed to do.  H.R. REP. No. 93-1600, P.L. 93-638, at 7 (1974).  In enacting the ISDA, Congress issued the following statement of findings:

> (1)  the prolonged Federal domination of Indian service programs has served to retard rather than enhance the progress of Indian people and their communities by depriving Indians of the full opportunity to develop leadership skills crucial to the realization of self-government, and has denied to the Indian people an effective voice in the planning and implementation of programs for the benefit of Indians which are responsive to the true needs of Indian communities; and

3

(2)   the Indian people will never surrender their desire to control their relationships both among themselves and with non-Indian governments, organizations, and persons.

25 U.S.C. § 450(a).

Following these preliminary findings is a "congressional declaration of policy" which recognizes the government's duty to "respond to the strong expression of the Indian people for self-determination by assuring *maximum Indian participation* in the direction of educational as well as other Federal services to Indian communities so as to render such services more responsive to the needs and desires of those communities."  25 U.S.C. § 450a(a) (emphasis added).  The ISDA therefore aims to promote tribal autonomy and self-determination by permitting tribes to operate programs previously operated by the federal government, while also ensuring that the tribes do not suffer a reduction in funding for those programs simply because they assume direct operation of them.  *See, e.g., Cherokee Nation of Okla. v. Thompson*, 311 F.3d 1054, 1055 (10th Cir. 2002), *rev'd on other grounds*, 543 U.S. 631 (2005).  The Act accordingly directs the Secretary of Health and Human Services and/or the Secretary of the Interior, upon the request of an Indian tribe, to enter into a self-determination contract that provides funding to the tribe to administer certain programs that the Secretary would otherwise administer, as long as the tribe meets specific statutory criteria.

The ISDA specifies that the government must pay a tribe's costs of administering a program under a self-determination contract, including administrative expenses.  *See* 25 U.S.C. §§ 450j-1(a)(1) & (2).  Administrative expenses include (1) the "secretarial program amount" or "tribal shares", defined as the amount that the agency would have spent on the operation of the program had the agency itself managed the program, and (2) "contract support costs."  § 450j-

1(a)(1)-(2).  The ISDA defines contract support costs, or "CSCs", as other "reasonable costs" that a federal agency would not have incurred, but which nonetheless a tribal organization acting as a contractor would incur "to ensure compliance with the terms of the contract and prudent management." *Id*. at § 450j-1(a)(2).

## II.     Ramah Navajo School Board

The Ramah Navajo School Board is a federally recognized Indian tribal organization consisting of all adult members of the Ramah Navajo tribe.  RNSB was created by, and is directed by, the Ramah Navajo Chapter.  The greater Navajo Nation as well as the Ramah Navajo Chapter have sanctioned RNSB to operate educational and health programs for the Ramah Navajo community.

Since 1977, RNSB has contracted with the Indian Health Service pursuant to the ISDA for the direct operation of health care and related services to the Ramah Navajo community.  One such service is the operation of the Pine Hill Health Clinic, which is an outpatient clinic located in the Ramah Navajo community.  RNSB operates this clinic pursuant to an ongoing contract, or "mature contract," which the parties supplement annually with a new funding agreement.  The contract allots specific funding for various programs, including routine health care services such as family medicine, pre- and post-natal care, and general chronic health issues, as well as behavioral and mental health, dental services, public health nursing, emergency medical services, nutrition education, and an ambulatory clinic.  The clinic is open during business hours five days a week, and it also operates an emergency ambulance service twenty-four hours per day.  Since its founding in 1977, it has grown substantially, yet it still contracts out various services that it is

unable to provide directly.  Nonetheless, budget constraints are such that the clinic remains busy year-round, and is generally overbooked during the flu season.

## III.     Origins of the Instant Dispute

In 2006, Carolyn Finster, the director of the Pine Hill Clinic, attended an IHS regional conference.  At this conference, Ms. Finster learned that RNSB was not receiving all of the tribal shares to which it was entitled under its mature contract.  At the conference and during subsequent correspondence, Tony Danielson, the IHS project director at the time, informed Ms. Finster that in order to receive these shares, RNSB would have to submit a formal contract proposal.  This puzzled and frustrated Ms. Finster because she believed RNSB should have been entitled to the funds under the mature contract, as RNSB was already providing the services associated with the shares at issue.  On October 16, 2006, RNSB submitted a formal proposal for the remaining shares, to which IHS responded on October 31, 2006.  *See* Pl.'s Exs. 27F& 27G. IHS informed RNSB that it had no contract support costs available for the new and/or expanded programs that were subject to the proposal.  Accordingly, IHS would enter new contracts only if tribes agreed to specific language waiving their right to receive contract support costs.  RNSB refused to agree to this language, and IHS formally declined the contract proposal on January 12, 2007.  Pl.'s Ex. 27J.

Although the Court ordered IHS to fund RNSB's contract proposal on February 6, 2008, IHS failed to do so due to a disagreement between the parties about the language of a going-forward contract.  It was not until nearly three years later, in December of 2010 – six months after Judge Torgerson admonished Defendants for failing to follow this Court's order – that the

parties entered a going-forward contract.  Funds for the period from January 2007 through

December 2010 are still at issue.

Plaintiff requests tangible damages in the amount of $3,600,370, which it states

represents the amount of money directly traceable to the contract declination.  Plaintiff further

requests an unspecified quantity of intangible damages to compensate it for the harm it suffered

due to its inability to assume control over the provision of the services in question to its tribal

members.  As a threshold matter, Defendants argue that damages are never an appropriate

remedy for a contract declination under the ISDA.[1]  Defendants further argue that Plaintiff has

failed to prove its requested damages with reasonable certainty.

## EVIDENCE PROFFERED AT THE HEARING

**I.      Summary of Plaintiff's Witnesses**

RNSB first proffered the testimony of Carolyn Finster, who has directed the Pine Hill

Clinic for eighteen years.  She testified primarily about the events precipitating this dispute.

Next, Plaintiff presented the testimony of Bennie Cohoe, executive director of RNSB, who

testified regarding the effects he observed resulting from IHS's declination.  Following Mr.

Cohoe's testimony, Priscilla Kaye, human resources director for RNSB, testified briefly for

Plaintiff.  She discussed some of the social woes inflicting the Ramah Navajo community and

recounted negative experiences she and her family members had at the Zuni Hospital.  Next

Manley Begay, Jr. testified for RNSB as to the question of intangible damages.  Professor Begay

is a social scientist and senior lecturer at the American Indian Studies Program at the University

---

[1] Defendants have advanced this argument throughout the course of this litigation, and as the Court explained in its September 28, 2011 Memorandum Opinion and Order (Doc. 99), it does not find the argument to be persuasive. However, the issue merits further analysis  in light of the  Supreme Court's decision last term in *Federal Aviation Administration v. Cooper*, 132 S. Ct. 1441 (2012).

of Arizona, as well as co-director of the Harvard Project on American Indian Economic

Development.  Following Professor Begay's testimony, Plaintiff called Dr. Miriam Jorgensen to

testify primarily on the topic of tangible damages.  Dr. Jorgensen is a research professional

employed by the University of Arizona's Native Nations Institute for Leadership, Management

and Policy, as well as the Harvard Project for American Indian Economic Development.  Finally,

Plaintiff presented the testimony of Peterson Zah, the former chair of the Navajo Tribal Council

and former president and Chief Executive Officer of the Navajo Nation.  Mr. Zah, who is now a

member of the U.S. Secretary of the Interior's Commission on Indian Trust Administration and

Reform, testified regarding intangible harms in the form of depressed social conditions that the

Ramah Navajo community suffered as a result of Defendants' wrongful declination.

## II.     Summary of Defense Witnesses

Defendants called three witnesses to challenge Plaintiff's claims for damages.  First they

called Jean Othole, who is the CEO of the Zuni-Ramah Service Unit ("ZRSU").  The ZRSU

encompasses both the Zuni Hospital and the Pine Hill Clinic.  Ms. Othole described the services

offered at the Zuni Hospital and provided an overview of its budget and finances.  She also

presented data as to the frequency with which Ramah Navajos utilize the hospital's services.

Next, John Tafoya testified.  He was a budget officer and accounting supervisor with the

Albuquerque Area Indian Health Service when this litigation commenced.  Mr. Tafoya testified

as to the circumstances surrounding IHS's declination of RNSB's contract proposal.  Finally,

Defendants presented the testimony of expert economist Dr. Jonathan Neuberger.  Dr. Neuberger

opined that Plaintiff's methodology for calculating tangible damages was flawed.  He further

opined that Plaintiff failed to identify the intangible damages that were actually attributable to

Defendants' conduct, and also failed to articulate a specific basis for the Court to calculate

intangible damages.  These factors, Dr. Neuberger believed, were fatal flaws in Plaintiff's claim

for intangible damages.

## III.   Evidence Concerning Tangible Damages

### A.   Testimony of Carolyn Finster

Ms. Finster, who directs the Pine Hill Clinic, first provided some background about

RNSB, the clinic, and the greater Ramah Navajo community.  She discussed the founding of

RNSB as well as the beginning of its contractual relationship with the federal government

pursuant to the ISDA.  She listed the services the clinic provides and explained who is eligible to

receive these services.  She emphasized the cultural differences between the Zuni and Ramah

Navajo people, noting that each tribe's ancestors come from different regions and the tribes

speak distinct and unrelated languages.  With substantial detail, Ms. Finster discussed the

conditions of the clinic and listed equipment the clinic lacked due to insufficient funds.  She then

devoted the bulk of her testimony to the events leading up to the instant lawsuit.  *See* pp. 5-7,

*supra* (section titled "Origins of the Instant Dispute").

### B.   Testimony of Dr. Miriam Jorgensen

Dr. Miriam Jorgensen began by highlighting her academic and professional background,

including previous research she conducted concerning health care conditions in Indian country.

She then explained the methodologies she applied to calculate tangible damages in this case, as

well as factors she believed were important to the Court's calculus of intangible damages.

Dr. Jorgensen testified using an exhibit depicting her assessment of the tangible damages

RNSB suffered due to IHS's declination of its contract proposal.  As a component of her

damages calculation, she utilized a but-for analysis, in which she compared the present circumstances to what would have occurred had the contract been awarded as of 2007.  Utilizing this analysis, she derived four categories of tangible damages for 2007 through 2010: (1) lost tribal shares, (2) lost contract support costs, (3) lost third-party reimbursements, and (4) an economic multiplier for Cibola County, New Mexico, derived from data published by the Bureau of Economic Analysis.[2]

        To arrive at her damages calculation concerning tribal shares and contract support costs, Dr. Jorgensen simply added the amounts that would have been due under the contract, had IHS not declined it.  The remaining categories of damages identified by Dr. Jorgensen require a bit more explanation.

        Lost third-party reimbursements are the monies that RNSB would have received from third-party insurers (private insurance companies, Medicare, and Medicaid), had it been awarded the requested contract and provided services under that contract.  When a patient receives medical services at the Pine Hill Clinic, the clinic in turn bills that person's insurer, and this generates additional income for the clinic.  According to Dr. Jorgensen, Congress calculates its appropriations for IHS under the assumption that providers will bill third parties, particularly Medicaid.  In other words, Congress deliberately underfunds self-determination contracts because it is standard practice for providers to bill third-party insurers, and generate additional income from these billings.

        Dr. Jorgensen calculated lost third-party reimbursements by determining the ratio between the amount of money the Pine Hill Clinic received from its other contracts with IHS and

---

[2] The latter three categories are still at issue for 2011 through the first half of 2012.  Pursuant to the parties' going-forward contract, which they entered in December 2010, IHS paid RNSB its tribal shares for 2011 and 2012.

the third-party funds it received as a result of those contracts.  For example, in 2007, the clinic

received a total of $3,164,489 from IHS, and in turn generated $1,010,693.31 in third-party

reimbursements.  *See* Pl.'s Exs. 49 & 50.  Dr. Jorgensen determined these numbers for 2007

through 2009, computed the ratio between IHS receipts and third-party funds, and then averaged

the ratios.  She used the resulting number – 0.4 – to calculate lost third-party revenues for the

declined contract, which covered the same time period plus 2010.

Finally, Dr. Jorgensen discussed damages based on an economic multiplier.  Dr.

Jorgensen derived the economic multiplier from Bureau of Economic Analysis ("BEA") data

documenting Regional Input/Output Modeling System multipliers for output earnings and

employment, and value added by industry aggregation.  *See* Pl.'s Ex. 52.  Because Dr.

Jorgensen's task involved an outpatient clinic, she utilized the BEA's regional multiplier for

ambulatory health care services.  She described the economic multiplier as "a representation of

the value that would flow through the community from the initial spending of these dollars."

Doc. 131 at 112:1-3.  Dr. Jorgensen stated that utilizing this number is "a standard economic

technique" – it accounts for the economic gain the community would have enjoyed had the

money subject to the contract proposal entered the local economy.  Doc. 131 at 118:10.  The

specific multiplier representing ambulatory health care services is 1.3398.  Pl.'s Ex. 52 at 2.

Dr. Jorgensen noted that the economic multiplier she used was for Cibola County, which

is the county in which the majority of Ramah Navajo land lies, although parts lie in McKinley

County.  A more precise economic multiplier would be one for the Ramah Navajo community

itself, but such data do not exist.  Accordingly, the economic multiplier for Cibola County,

though not entirely precise, is the most accurate number available.  Dr. Jorgensen emphasized

that the BEA's models are complex, and she does not know if it would even be possible to ascertain an accurate economic multiplier for a community as small as the Ramah Navajo.

In anticipation of Defendants' argument regarding double-counting, counsel for RNSB asked Dr. Jorgensen if her calculation of the economic multiplier amount would be negated or reduced if RNSB in fact receives a damages award in this case, given that the money in question would enter the community at that time, and would then create the multiplier effect.  Dr. Jorgensen responded in the negative:

> [T]his is the dollars flowing through the community over time . . . .  If this money had entered as appropriate in 2007 when [RNSB] asked for it, it would have generated this economic multiplier as it flowed through the system . . . .  So it would have generated these economic returns at the time the money was spent, and that's an important aspect of the but-for [analysis].

Doc. 131 at 122:3-19.  She further explained:

> What the economic multiplier represents is as money is spent in the community, it generates these knock-on effects of re[-]spending. And in this case, that knock-on effect as told to us by the Bureau of Economic Analysis is a 0.34 extra push-up in the value of this money. So as it's spent in the community, it generates – as one dollar is spent, it generates another 34 cents.

*Id*. at 138:5-12.

On cross-examination, defense counsel asked Dr. Jorgensen a series of questions which aimed to undermine the accuracy of the Cibola County economic multiplier when applied to the Ramah Navajo reservation.  Dr. Jorgensen stated she is aware that Cibola County's population is 25,000, and it includes the city of Grants, whose population is 10,000.  She agreed that, if more specific economic multipliers were available for smaller areas within counties, a city would likely have a higher economic multiplier than a rural area.  Nonetheless, Dr. Jorgensen confirmed that she did not reduce the Cibola County rate when making her estimate for the

Ramah Navajo reservation, whose population is 4,000.  She explained that while Grants might

have a higher value, other areas even less dense in population than Ramah might have a smaller

value.  She stated that the testimony at the hearing, as well as her visit in Pine Hill, confirmed

that the Ramah Navajo reservation has "ways to recycle dollars," including a convenience store,

a gas station, a health care clinic, a cafeteria, and other local vendors.  Doc. 131 at 141:7.

      **C.**    **Testimony of Jean Othole**

Jean Othole is a member of the Zuni Pueblo and she is the CEO of the Zuni-Ramah

Service Unit.  She testified regarding an exhibit she prepared tracking the number of Ramah

Navajo people who have received medical services at the Zuni Hospital.  The chart depicts

Ramah Navajos who were "active users" at the Zuni Hospital in the years 2006 through 2011.

*See* Def.'s Ex. D.  An "active user" is someone who has visited the hospital in the last three

years.  Doc. 132 at 7:9-11.  To summarize and approximate the conclusions Ms. Othole (and

Defendants) derived from this exhibit, between 44 and 45% of Ramah Navajos who received

health care through the Zuni-Ramah Service Unit during the years 2006 through 2011, received

care at the Zuni Hospital.  In comparison, Plaintiff prepared an exhibit depicting the number of

patients actually receiving health care services each year.  Plaintiff's exhibit demonstrates that

Ramah Navajos make up roughly 6.27% of the patient population at the Zuni Hospital.

Ms. Othole explained that the Zuni Hospital employs one Navajo interpreter as well as

several staff members who are Navajo.  Out of 200 employees, seven to ten are Navajo, and four

of those individuals speak Navajo and can interpret on behalf of Navajo-speaking patients if

needed.  However, they are not trained interpreters.

### D. Testimony of John Tafoya

At the time this litigation commenced, John Tafoya was a budget officer and accounting supervisor with the Albuquerque Area Indian Health Service. At the hearing, he discussed the circumstances surrounding IHS's declination of RNSB's contract proposal. Mr. Tafoya explained that at the time of RNSB's proposal, his role was to ensure that IHS had adequate funds for self-determination contracts and that that funds were properly distributed to tribal contractors pursuant to those contracts.

Mr. Tafoya explained that a tribal contractor can assume partial control over a program, function, service or activity ("PFSA") pursuant to a self-determination contract, leaving provision of the remainder of the PFSA to IHS. When Plaintiff's counsel questioned him on cross-examination about whether or not the contract proposal at issue proposed to expand RNSB's scope of work under the existing contract, Mr. Tafoya did not know. His function was not to determine program levels, but rather to properly allocate funds. He confirmed that when a tribe takes responsibility for the provision of services to its members, this reduces the services provided by IHS. In Mr. Tafoya's words, "the whole purpose of IHS is to contract themselves out of a job." Doc. 132 at 76:6-7.

### E. Testimony of Jonathan Neuberger

Defendants called Dr. Jonathan Neuberger as an expert witness to testify as to the question of tangible damages, and to a lesser extent, intangible damages. After detailing his credentials as an economist, he provided some background on his previous assignments as an expert witness. Primarily, Dr. Neuberger has testified regarding the quantification of economic damages, but has also engaged in qualitative analyses and valuation. He has no expertise in

Native American culture or history, nor in the provision of health care services, but he stated that his lack of experience in any given industry does not affect his ability to apply his expertise as an economist to the specific question of economic damages.  He noted that most of his work as an expert witness had been on behalf of the federal government, but he stated with confidence that this does not bias his opinion in the government's favor.

Dr. Neuberger described his task as: "the application of basic and fundamental principles of economics and the quantification of harm, to assess plaintiff's claim and determine wither it's consistent with those fundamental principles [a]nd with professional standards[.]"  Doc. 132 at 97:12-18.  He primarily addressed Dr. Jorgensen's analysis of tangible damages, but also to some extent on Dr. Begay's and Mr. Zah's discussion of intangible damages.

Dr. Neuberger opined that Plaintiff's theory of damages was unreliable because it failed to isolate the harm resulting from IHS's declination of the contract proposal, from other harms that already plagued the Ramah Navajo community.  In Dr. Neuberger's opinion, Plaintiff's claim included harms that were either remote from, or entirely unrelated to, the contract declination at issue.  He also opined that Plaintiff's methodology in applying the but-for analysis was flawed because it did not effectively account for all relevant characteristics that would be present in the but-for world.  He concluded that this analysis did not satisfy basic professional standards for quantifying harm.

With respect to the but-for analysis, Dr. Neuberger testified that Plaintiff did not adequately address whether health care services to the Ramah Navajo community were materially different from what they would have been in the but-for world.  Although Plaintiff offered testimony about the community's needs, it did not offer testimony about what the Pine

Hill Clinic would have done had it received the funds in question.  He concluded that Plaintiff's

"wish list" of items it might have considered when it received the money, standing alone, was an

inadequate but-for analysis. He bolstered this point by highlighting RNSB's reserve accounts,

opining that these accounts were "substantial," and sufficient to pay for some of the services that

Plaintiff's witnesses stated they might have provided had the contract been awarded.  Doc. 132 at

108:8.  Dr. Neuberger further stated that Plaintiff's analysis was flawed because it did not

account for the fact that IHS spent the funds at issue in the relevant service area, by providing

services at the Zuni Hospital.

Dr. Neuberger observed that reports of an independent auditor had identified problems

with RNSB's financial controls, which Dr. Neuberger believed signified management issues that

still would have existed in the but-for world.  The 2010 audit report states, among other things,

that "[b]udgetary control was non-existent" and that "RNSB started the year with unexpended

school grant funds in excess of eight million dollars."  Pl.'s Ex. 12 at 49.  The report further

states that a non-profit organization such as RNSB should budget up to five percent of its

available funds in a reserve account, and that RNSB's large reserves indicate a failure on the

parts of the controller and the director of administrative services.  While Dr. Neuberger

acknowledged that this portion of the report pertained specifically to school funds, he concluded

that excess reserves were a more general problem at RNSB.

Dr. Neuberger then addressed Dr. Jorgensen's precise methodology, using the chart she

created to calculate damages.  *See* Pl.'s Ex. 47A.  He opined that "the tribal shares at issue and

the associated contract support costs . . . don't necessarily qualify as damages . . . , because of the

. . . lack of characterization of the but-for world; these monies did go to the Zuni Hospital."  Doc.

16

132 at 115:7-12.  He concluded that Dr. Jorgensen's methodology for estimating lost third-party reimbursements was speculative: "[M]ore rigorous but-for world analysis would have been appropriate . . . .  [T]he tribal shares and the contract support costs don't give rise to third-party reimbursements.  Patient visits do."   Doc. 132 at 116:2-7.  He stated that Dr. Jorgensen's sampling of three years of data was insufficient, and noted that various scenarios would not have produced third-party reimbursements – for example, no third-party reimbursements would have accrued if the funds had been placed in RNSB's reserve account.

Dr. Neuberger critiqued Dr. Jorgensen's application of the BEA's economic multiplier for Cibola County as "pure speculation."  Doc. 132 at 118:25.  He first stated that Plaintiff offered no support for Dr. Jorgensen's assumption that money would have been spent in the Ramah Navajo community – which itself has few businesses – particularly because Cibola County has a broader economy than Ramah Navajo.  Furthermore, even if the economic multiplier were accurate, Dr. Jorgensen's analysis amounts to double-counting, because the multiplier effect will accrue when the award is made.  He acknowledged that "there may be some time value of money elements that could be included in a damages claim[,] [b]ut including this entire amount . . . would be a windfall to the Ramah Navajo."  Doc. 132 at 122:3-7.

On cross examination, Dr. Neuberger acknowledged that the fact that the Zuni Hospital used the funds in question to provide services did not necessarily mean that no damages were appropriate; rather, that Plaintiff's failure to account for this weakened its damages claim.  He stated: "What I would have expected to see . . . was a plausible plan for how the money would have been spent, or a plausible description of how the additional money would have affected the provision of health care services at Pine Hill."  Doc. 132 at 132:25-133:4.

17

**IV.    Evidence Concerning Intangible Damages**

**A.    Testimony of Bennie Cohoe**

Mr. Cohoe is RNSB's executive director, and prior to assuming this position he served in various posts in both the Navajo and Cibola County local governments.  In addition, Mr. Cohoe worked for the Ramah Navajo School Board for twenty-six years, beginning shortly after its founding.  He provided background regarding the establishment of RNSB, which is relevant to place the instant case in context.  After the State of New Mexico closed the Ramah Navajo community's local public school, children were bussed to Zuni, or in some cases, to off-reservation schools in other states.  After two unsuccessful lawsuits against the State, the community came together to establish RNSB in 1970, five years before the ISDA was formally enacted.  The Ramah Navajo tribe's successful establishment of its own school paved the way for similar self-determination efforts across the country.  Before the school formally opened its doors, children received both educational and health care services in the Pueblo of Zuni.  Mr. Cohoe – who was a pupil transportation supervisor at the time – coordinated the bussing of children from Ramah to the Zuni Hospital to receive medical care.  To his and the community's dismay, the children would often return after a full day in Zuni, not having seen a doctor or otherwise received treatment.  This prompted RNSB to request additional funding from Congress so that it could administer health care programs, in addition to operating a school.  As a result, RNSB opened the country's first tribally owned and operated health care clinic under the ISDA.

Mr. Cohoe also testified in detail regarding the demographics and physical and social conditions of the Ramah Navajo community.  The population lives in overwhelming poverty, and the majority of homes lack electricity and running water.  He testified using a DVD exhibit

depicting the Ramah Navajo community, and he discussed the distance between Ramah and Zuni, as well as the difficult conditions one must traverse to travel this distance.  For example, Mr. Cohoe stated that the Ramah Navajo reservation has only one paved road.  The remainder of the roads are dirt or, in some cases, gravel.  It is commonplace for winter conditions – when the temperature can fall to forty degrees below zero – to render these roads impassable.

Mr. Cohoe spoke about the inadequacy of the services available at the Zuni Hospital; namely that many Ramah Navajos have complained that Zuni Hospital staff refuse to serve them due to insufficient funds at Zuni, as well as a general sentiment that "you have that contract [], go back to Pine Hill, that's where you should be served."  Doc. 123 at 166:10-12.  As a result, preventable diseases are not detected as early as they could be, and Mr. Cohoe suggested that at least one community member's death could have been prevented.

He then discussed RNSB's overall budget as well as the health care budget specifically, focusing on the size of RNSB's reserve account.  Mr. Cohoe briefly discussed ways RNSB might have spent the funds had the contract been awarded; for example, the school, which lost its counselling program a number of years prior and suffered a decline in enrollment as a result, would have used the funds to replace it.  He further testified that he had observed various effects on RNSB resulting from IHS's declination of the 2006 contract proposal, namely, a negative impact on the organization's morale.

### B.     Testimony of Professor Manley Begay, Jr.

Professor Manley Begay is an associate social scientist and senior lecturer at the American Indian Studies Program at the University of Arizona.  He also codirects the Harvard

Project on American Indian Economic Development.  At the University of Arizona, he teaches courses in indigenous nation building, as well as other subjects.

Professor Begay joined the Harvard Project on American Indian Economic Development ("Harvard Project") in 1988, initially as a research assistant, and he eventually became its co-director.  The Harvard Project studies indigenous communities across the world in an effort to understand why some communities are more successful economically than others.  The Harvard Project has identified a direct link between successful economic development and self-determination and tribal sovereignty; in the United States, a number of Native American nations "turn[ed] their poverty-stricken state[s] around" after the ISDA's passage. Doc. 131 at 9:8-9.

After discussing his credentials, Professor Begay described his assignment in this case and his methodology for carrying it out.  His task was to determine whether or not the contract declination at issue in this litigation had resulted in intangible damages to RNSB, and he did this primarily by conducting interviews with community members.  In describing the methodology for his research, Professor Begay explained that he interviewed roughly fifty members of the Ramah Navajo community.  Some of the interviewees were invited, whereas others selected themselves for the interview after hearing that researchers were present to discuss the contract declination.  RNSB leaders as well as community members expressed to him that the declination had disrupted a Navajo concept called *hoz'ho*, whose closest – though not precise – English translation is harmony in the community.  *Hoz'ho* is based upon two distinctly Navajo concepts: *k'e*, which Professor Begay defined as love, understanding, and respect, and *kei*, which is marked by a kinship and clan relationship.  According to Professor Begay, prior to the declination, RNSB leaders believed that under the ISDA, their relationship with the federal government was

20

a partnership defined by *k'e* and *kei*.   However, community members experienced an erosion of *hoz'ho* following the contract declination.

In order to verify the data Professor Begay received during his interviews of members of RNSB and the Ramah Navajo community, he utilized a social scientific method called triangulation.  Triangulation is a method of cross-checking the validity of the results any given research project yields.  Under a triangulation theory, if a different method of research produces the same results, those results are inherently more accurate.

Here, Professor Begay verified the interviewees' data and information against the data and information provided by other interviewees, as well as the data and information collected by other trained researchers with whom he was working.  These researchers were Peterson Zah, Miriam Jorgensen, Dr. Jennie Joe, a Navajo researcher and health policy expert who is a professor at the University of Arizona, and Dr. Jon Thurber, a Harvard-trained researcher.  Next, the researchers presented their findings to community leaders, who stated they believed the findings were accurate.  Through their research, Professor Begay and his colleagues concluded that the Ramah Navajo community felt most strongly that IHS's actions in this declination had caused a disruption of harmony in the community.  In addition, Professor Begay observed a general sentiment in the community that the health care available at the Zuni Hospital was inadequate.  Many community members made this point by recounting the same story of a man who had died due to an infection they believed was preventable, and they believed his death would not have occurred had he been treated at the Pine Hill Clinic.  Professor Begay set forth a summary of the results of his research in a document titled "Adverse Impacts of the IHS's Failure to Provide Mandated Funds."  *See* Pl.'s Ex. 72B.

Professor Begay elaborated on the sense of disharmony to which he had testified.  He first explained that the Pine Hill Clinic is "the hub of the community," Doc. 131 at 42:10, where community members go not only for health care, but also to visit friends and relatives.  In addition, it is one of the primary employers in a community that suffers from 70% unemployment.  Given the Pine Hill Clinic's status as a hub of the community, community members often went there for the purpose of speaking with their leaders.  However, due to the amount of attention and time that community leaders needed to focus on this litigation, they were often unavailable to the members.

In expounding upon his conclusion that the declination disrupted *hoz'ho*, Professor Begay stated:

> [T]he [Indian] Self-Determination Act was explicitly written to [e]nsure the maximum participation of Indian people . . . in the rebuilding of their nation.  And when the U.S. government, in this case, the Indian Health Service, sort of ran bureaucratic walls, to fulfill this self-determination was actually inhibited.  And therefore the [A]ct, the spirit of the [A]ct, the intent of the [A]ct, was actually weakened because you essentially have an agreement between two nations, in this case, Ramah Navajo and the U.S. government.  And if one side does not fulfill this obligation . . . it creates this sense of, well, why should we go forward?  What's the sense of moving forward if, every turn that we take, we're stonewalled and we're given one bureaucratic barrier [after] another[?]

Doc. 131 at 50:22-51:22.  Professor Begay explained that a sense of hopelessness results from this dynamic, which the leaders and the community absorb, and it leads to increased social pathologies.  Professor Begay spoke specifically about heightened levels of domestic violence, substance abuse, and sexual abuse, as well as an increase in suicides in the community.  RNSB leaders and health care professionals believed that, had they had the funding, they would have

implemented a Strengthening Families Program.[3]  In addition, he believes that the Pine Hill

Clinic would have hired more psychologists, counselors, or psychiatrists to address the

community's heightened social pathologies, particularly suicide.[4]

On cross-examination, Professor Begay admitted that he had little knowledge about

RNSB's finances, including its budget, the amount of money it receives annually from IHS

pursuant to ISDA contracts, nor the amount at issue in the declined contract proposal.

Furthermore, in January and February of 2012, when he was conducting interviews and

gathering his data, he was unaware that the contract had been awarded in 2010.  Professor Begay

also opined that in the couple years leading up to 2012, social pathologies in the Ramah Navajo

community had continued to increase, even though the contract was awarded in 2010.

C.      **Testimony of Dr. Miriam Jorgensen**

In describing her background and qualifications, Dr. Jorgensen explained that prior to her

work on the instant case, she received a grant through the William K. Kellogg Foundation to

research the effects of community-controlled health care on improving health care access in

Native American communities.  She has also conducted research projects on the results of self-

governance under the ISDA and a similar self-determination effort under the Temporary Aid for

Needy Families (TANF) program.  In Dr. Jorgensen's research into the effects of tribes'

assumption of control over their own services she learned that

> tribes created programs that fit their communities better.  They were able to
> integrate across programs more effectively.  They were able to put priorities of the
> tribal community first.  And as those things were done, tribal communities
> responded with impressions that they were receiving higher-quality service.

---

[3] Strengthening Families is a parenting and family strengthening program designed primarily for high-risk families.
*See* http://www.strengtheningfamiliesprogram.org/ (last visited May 8, 2013).
[4] It should be noted that the Pine Hill Clinic's director, Carolyn Finster, said this as well.

Doc. 131 at 81:25-82:6.  She proceeded to provide concrete examples in her own research of the ways in which tribal control improved the quality of services, and she also discussed other studies that have yielded similar results.  *See id*. at 82-85.  Dr. Jorgensen described her conclusion in a 2007 paper titled "The Nature and Components of Economic Development in Indian Country," as follows: "As tribes increase their self-determination . . . and as they develop institutions that are their own and that have cultural fit and legitimacy within those communities, those are the tribes that are advancing in economic and community development."  Doc. 131 at 87:17-22.

In January and February of 2012, Dr. Jorgensen interviewed Ramah Navajo community members and consulted literature and other experts' reports regarding the question of intangible damages in this case.[5]  Ultimately, she concluded IHS's conduct in declining RNSB's contract proposal amounted to an interference with the principles of the ISDA and created intangible harms in the community.  She explained that when a tribe is wrongfully declined the opportunity to provide its own services pursuant to the ISDA, this amounts to programs and services that are less appropriately matched to the community's needs.  In a health setting, this harms the community's health.

### D.    Testimony of Peterson Zah

Peterson Zah, who testified as an expert witness on the topic of intangible damages, is a member of the U.S. Secretary of the Interior's Commission on Indian Trust Administration and Reform.  Prior to this post, he served as chair of the Navajo Tribal Council and Chief Executive Officer of the Navajo Nation, and he was then elected as the Navajo Nation's first president.  Mr. Zah also served as president of the first all-Navajo public school board.  He helped to establish –

---

[5] A list of materials Dr. Jorgensen consulted is attached to her CV.  Pl.'s Ex. 74, App. B.

and later became the executive director of – the largest legal services organization in the country that serves the American Indian community, DNA People's Legal Services.  Advocacy for tribal sovereignty and self-governance was a large component of Mr. Zah's work at DNA.  Later Mr. Zah became the chairman and eventually the President of the Navajo Nation.  He then worked as advisor on Indian affairs to the president of the University of Arizona, where he established a Native American Achievement program.

Mr. Zah first discussed cultural differences and tensions between the people of the Ramah Navajo and Zuni tribes.  He stated that historically, the two tribes have experienced conflict, which he analogized to nations in the Middle East.  He opined: "[T]here's a problem with Indian Health Service thinking that, Well, if we give our money to Zuni, Navajos can always get full services there without any kind of ill feelings."  Doc. 131 at 19-22.  In Mr. Zah's opinion, IHS's treatment of the Ramah Navajo is marked not only by this lack of understanding, but also by a prejudice against the Ramah Navajo due to the tribe's history of lawsuits against the federal government.

After discussing the tensions that frame the relationship between the Ramah Navajo tribe and IHS, Mr. Zah focused on the declination at issue in the instant case.  He testified that the spirit of the ISDA has instilled a sense of self-motivation in Indian communities, and that the declination reversed that progress.  He stated that, "to some degree," Doc. 131 at 193:12, IHS's declination caused the deterioration of social conditions in the Ramah Navajo community, including reduced school enrollment, unemployment, and suicides.  He believes that the Ramah Navajo people's "hopes and their aspirations and their goals were completely, in some ways, destroyed . . . when they were turned down."  Doc. 131 at 195:19-21.  He further concluded that

the declination caused disharmony in the community, and caused community members to distrust the leadership.

On cross-examination, Mr. Zah said that he gathered his information during a three-day visit to the Ramah Navajo community, where he interviewed community members.  He did not select the participants; rather, RNSB and its counsel did so, and a number of participants caught word of the interviews and volunteered to participate.  Mr. Zah stated that although he was aware that RNSB entered into a contract for the funds at issue at the end of 2010, he did not ask community members how conditions have changed since that contract was awarded.  In addition, although Mr. Zah claimed that he did not observe the same poor social conditions during his last visit to Ramah six or seven years prior, defense counsel highlighted Mr. Zah's inconsistent deposition testimony in which he stated that at that time those social conditions were "pretty well along towards the direction that they were in."  Doc. 131 at 204:21-22.  Mr. Zah agreed with defense counsel that other lawsuits in which RNSB is involved have also contributed to disharmony.  Finally, he stated that he was unable to quantify the intangible harm that RNSB has suffered due to the declination, nor was he able to separate RNSB's harm from the harms suffered by the community.

## E.    Testimony of Dr. Jonathan Neuberger

Dr. Neuberger found immediate flaws in Plaintiff's claim of intangible damages, primarily because Plaintiff did not attempt to quantify them.  He further stated that this claim "most clearly confuses related harm and unrelated harm."  Doc. 132 at 123:13-14.  He stated that Dr. Begay and Mr. Zah's reports, although sincere, primarily detailed harms that were entirely

unrelated to the contract declination.  Dr. Neuberger criticized Plaintiff's experts' failure to

delineate between the actual world and the but-for world:

> In all likelihood, the 2008 recession would have happened regardless of whether
> the contract was declined.  The longstanding conditions of economic hardship
> among the Ramah Navajo preexisted the declination of this contract, and in all
> likelihood wouldn't have been much different if the contract had been granted.

Doc. 132 at 124:14-20.

Upon the conclusion of his testimony, the Court asked Dr. Neuberger what factors he

would take into consideration in the calculation of intangible damages.  He responded:

"Intangible harm, from an economist's perspective, usually must be reflected in some kind of an

economic measure, something that's quantifiable.  Very difficult."  Doc. 132 at 145:12-15.

Using the example of damages for pain and suffering, Dr. Neuberger stated that as an economist

he would

> look at costs that have to be incurred to deal with counseling or quality of life
> issues and that kind of thing . . . .  [Economists] look for proxies that may provide
> some number, that enables you to say, Okay, this pain and suffering is worth X or
> Y or whatever it might be.  And some of those considerations typically enter into
> costs incurred, alternative expenses, opportunity costs, what you could have been
> doing, what you might have earned had you not incurred a particular injury, or
> something like that.  So, for better or for worse, economists want to look for
> something that's quantifiable, where there's actually a dollar figure.

Doc. 132 at 145:18-146:5.  When the Court asked Dr. Neuberger to provide additional guidance

on quantifying damages for harms that simply cannot be translated into an economic value –

such as "[the ability] to smile or to hold our children or to be able to enjoy family life," Doc. 132

at 147:25-148:1 – he stated that this question went beyond his expertise.

**DISCUSSION**

I.      **Threshold Issues**

        A.      **Sovereign Immunity**

        Like at previous stages in this litigation, Defendants argue that damages are permissible

only when a contract is entered into and subsequently breached.  The Court fully addressed and

rejected this argument in its September 28, 2011 Memorandum Opinion and Order.  *See* Doc. 99

at 6-8.  However, the Court will briefly revisit the argument in light of an intervening Supreme

Court decision addressing the doctrine of sovereign immunity.

        In *Federal Aviation Administration v. Cooper*, 132 S. Ct. 1441 (2012), the Supreme

Court analyzed whether Congress had waived sovereign immunity in a particular provision of

the federal Privacy Act.  The question in *Cooper* was whether damages for mental and emotional

distress fell under the Privacy Act's definition of "actual damages."  The Court concluded that

this category of damages was not within the scope of the statutory definition of "actual

damages," reasoning:

>       [B]ecause the Privacy Act waives the Federal Government's sovereign immunity,
>       the question we must answer is whether it is plausible to read the statute, as the
>       Government does, to authorize only damages for economic loss.  When waiving
>       the Government's sovereign immunity, Congress must speak unequivocally.
>       Here, we conclude that it did not.

*Id*. at 1453 (citations omitted).  Defendants point to this language in *Cooper* to argue that the

Court must accept their reading of the ISDA's remedial provision so long as it is plausible.

        The instant case may be distinguished from *Cooper*.  This case involves a separate canon

of statutory interpretation that applies to laws enacted for the benefit of Native Americans.  The

Tenth Circuit has explained that if the ISDA "can reasonably be construed as the Tribe would

28

have it construed, it must be construed that way." *Ramah Navajo Chapter v. Salazar*, 644 F.3d 1054, 1062 (10th Cir. 2011), *aff'd*, 132 S. Ct. 2181 (2012). In *Ramah Navajo Chapter*, the Tenth Circuit also found it relevant that the ISDA's legislative history includes the following principle: "Federal action toward Indians as expressed in treaties, agreements[,] statutes, executive orders, and administrative regulations is construed in light of the trust responsibility." *Id*. at 1063 (quoting S. Rep. No. 100–274, at 3 *reprinted in* 1988 U.S.C.C.A.N. at 2622). In its opinion upholding this Tenth Circuit decision, the Supreme Court affirmed this canon of statutory construction. *See Salazar v. Ramah Navajo Chapter*, 132 S. Ct. 2181, 2193 (2012) ("ISDA is construed in favor of tribes.").

Accordingly, the instant case involves two canons of statutory interpretation, one requiring the Court to construe the ISDA in Plaintiff's favor, and the other precluding the Court from finding a waiver of sovereign immunity unless it is the only plausible reading of the statute. The circumstances of the instant case give rise to an undeniable tension between these two canons. Such tensions are common. *See Landgraf v. USI Film Products*, 511 U.S. 244, 263 (1994) ("It is not uncommon to find 'apparent tension' between different canons of statutory construction."). In *Cooper* itself, the Supreme Court acknowledged that the presumption against a waiver of sovereign immunity is not the be-all-end-all, cautioning that "the sovereign immunity canon is a tool for interpreting the law[,] and [] it does not displace the other traditional tools of statutory construction." 132 S.Ct. at 1448. Accordingly, it is only when the scope of Congress's waiver is not "clearly discernable from the statutory text in light of traditional interpretive tools," *id*. – which include the canon of construction favoring tribes – that courts must employ this canon favoring the government. Unlike *Cooper*, where the Supreme Court noted that "the

29

meaning of 'actual damages' is far from clear," *id.* at 1449, the ISDA authorizes this Court to

"order appropriate relief including money damages" in an action brought under its provisions.

To bolster their argument that the ISDA does not meet the standard articulated in *Cooper*,

Defendants assert that "[t]he Supreme Court requires an unambiguous waiver of sovereign

immunity for the government to be liable for money damages, notwithstanding the canon that

ambiguous statutes be construed in favor of Indians."  Doc. 136 at 5 n.2 (citing *United States v.*

*Mitchell*, 445 U.S. 535 (1980)).  However, Defendants' reliance on *Mitchell* is misplaced.  The

statute in question in *Mitchell* did not provide for money damages under any circumstances.  A

group of Native American allottees of Quinault Reservation land sued the federal government for

money damages under the General Allotment Act, arguing it had mismanaged forests on the

land.  The plaintiffs conceded that the language of the General Allotment Act did not provide for

money damages, but argued that the spirit of the Act conferred a fiduciary duty upon the federal

government which amounted to a waiver of sovereign immunity.  The Supreme Court rejected

this argument under two theories: First, Congress had not unequivocally waived its sovereign

immunity, and second, the legislative history of the General Allotment Act "plainly indicates that

the trust Congress placed on allotted lands is of limited scope."  445 U.S. at 543.  The Court

accordingly held that the Act's mandate that the government hold the land at issue "in trust for

the sole use and benefit of the [allottees]" did not create an express trust for which money

damages were available in the event of a breach.  Defendants' argument – that *Mitchell* stands

for the proposition that the canon concerning sovereign immunity somehow trumps the canon

requiring construction in favor of the tribes – is simply incorrect.  Nowhere does *Mitchell*

mention the canon of statutory construction that ambiguous statutes be resolved in favor of

Native Americans, because the Court in that case was not dissecting an ambiguity.  In contrast to the General Allotment Act, the ISDA expressly provides for money damages and hence unequivocally waives Congress's sovereign immunity.

In conclusion, *Cooper* does not alter the Court's conclusion regarding the availability of money damages under the ISDA in circumstances such as these, where no contract was ever entered.  Rather than rehash its analysis as to the availability of money damages in the absence of a contract, the Court would refer to its Memorandum Opinion and Order issued September 28, 2011.  *See* Doc. 99 at 6-8.

### B.    Expert Testimony of Dr. Begay and Mr. Zah

Prior to the June 2012 evidentiary hearing, Defendants moved to exclude the testimony of Plaintiff's proffered experts, Peterson Zah and Manley Begay, Jr.  Defendants argued that Professor Begay was not qualified to testify as an expert.  They argued that Mr. Zah was not qualified to testify as to the impact of the contract declination on the Ramah Navajo, but they did not object to his testimony on the subject of Navajo culture and history.

On June 27, 2012, the Court issued an order denying Defendants' motion in limine.  Doc. 124.  In doing so, the Court relied heavily on *Attorney General of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009), wherein the Tenth Circuit held that *Daubert's* standards are relaxed in proceedings when the trier of fact is a judge, because "the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise."  Noting that *Tyson Foods* grants the Court "greater leeway in admitting questionable evidence, weighing its persuasive value upon presentation," *id*. at 780, the Court declined to exclude either proffered

expert's testimony "at this juncture." Doc. 124 at 7. It is now the Court's task to determine

whether and to what extent it will consider the testimony of Plaintiff's proffered experts.

### 1.        Standards for Considering Expert Testimony

Pursuant to *Daubert*, the Court must assess the reasoning and methodology underlying an

expert's opinion, and determine whether it is helpful to the trier of fact. *Daubert v. Merrell Dow*

*Pharm., Inc.*, 509 U.S. 579, 594–95 (1993). The Tenth Circuit has explained the Court's inquiry

under *Daubert* as follows:

> Rule 702 requires the district court to ensure that any and all [expert] testimony or
> evidence is not only relevant, but reliable. This obligation involves a two-part
> inquiry. A district court must first determine if the expert's proffered testimony
> has a reliable basis in the knowledge and experience of his or her discipline. In
> making this determination, the district court must decide whether the reasoning or
> methodology underlying the testimony is scientifically[6] valid. Second, the district
> court must further inquire into whether proposed testimony is sufficiently relevant
> to the task at hand.

*Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 883-84 (10th Cir. 2005) (internal quotations

and alterations omitted).

In *Daubert* the Supreme Court articulated a non-exclusive list of factors that govern the

reliability determination, including: (1) whether the method has been tested; (2) whether the

method has been published and subject to peer review; (3) the known error rate; (4) the existence

of standards and whether the witness applied them in the present case; and (5) whether the

witness's method is generally accepted as reliable in the relevant scientific community. 509 U.S.

579 at 594–95. Once reliability is established, it is within the Court's discretion to determine

whether expert testimony will be helpful to the trier of fact. *United States v. Goxcon-Chagal*,

866 F. Supp. 2d 1222, 1235 (D.N.M. Aug. 3, 2012) (citation omitted). When the Court itself is

---

[6] In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999), the Supreme Court expanded *Daubert's* standard to
non-scientific expert testimony that is based on "technical" and "other specialized" knowledge.

the trier of fact, the helpfulness prong is most aptly summarized as: "In essence, the question is whether the reasoning or methodology properly can be applied to the facts in issue." *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006) (quoting *Daubert*, 509 U.S. at 593).

### 2.      Testimony of Professor Manley Begay, Jr.

Defendants argue that Professor Begay's opinion is unreliable because he did not employ an acceptable methodology, but rather relied unquestioningly on statements of community members in forming his opinion.  Defendants highlight Professor Begay's incorrect beliefs about various facts of the case; for example, he believed that the Pine Hill Clinic reduced its hours of operation following the declination.  Defendants essentially argue that, in accepting the assertions of community members as true, Professor Begay developed a substantially mistaken understanding of the effects of the declination, and he failed to conduct an independent analysis of these objective factors for the purpose of verifying the information he received from community members.  When defense counsel questioned Professor Begay about these errors during his deposition, he responded that the errors were not attributable to him.

After summarizing the asserted reasons that Professor Begay's opinion is unreliable, Defendants turn to the second prong of the *Daubert* analysis, stating that even if the opinion were reliable, it is unhelpful.  They first note that Professor Begay declined to isolate the harms suffered by RNSB from those suffered by the Ramah Navajo community as a whole, nor did he isolate the harms attributable to the contract declination from those already afflicting the Ramah Navajo community.  With respect to this latter asserted deficiency, Defendants note that Professor Begay implicitly acknowledged during his deposition that other factors were relevant

33

to his analysis – such as the economic recession of 2008 and the fact that the contract was indeed approved over a year prior to the interviews he conducted – yet he nonetheless failed to account for these factors in evaluating the damages in this case.  Finally, Defendants argue that Professor Begay's inability to quantify the damages to which he testified makes his opinion unhelpful and irrelevant.

Even if the Court were to rely only on Professor Begay's CV, it would have no doubt that his particular area of expertise is relevant as to the question of damages in this case.  He has published numerous works and given many speeches on the topics of indigenous nation building and indigenous sovereignty.  His expert report uses examples of U.S. and Canadian tribes to illustrate the positive impacts in indigenous communities of local control over health care and other services.  After considering his testimony, the Court is only more confident that Professor Begay was a reliable and helpful expert.

Defendants' chief attack on Professor Begay's methodology is that he relied primarily on interviews to collect the information that formed the basis of his opinion.  However, Rule 703 allows an expert to rely on information gathered during interviews as long as "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject."  FED. R. EVID. 703.  "Social science experts commonly base their opinions on interviews."  *United States v. Joseph*, 542 F.3d 13, 22 (2d Cir. 2008) (*abrogated on other grounds by Hedgpeth v. Pulido*, 555 U.S. 57 (2008)).  Moreover,

> [s]ocial science research, theories and opinions cannot have the exactness of hard science methodologies . . . .  Peer review, publication, potential error rate, etc. are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it.

34

*Id.* at 21 (quoting *Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1297 (8th Cir.1997) and

*United States v. Hankey,* 203 F.3d 1160, 1169 (9th Cir. 2000)); *see also Cook v. Rockwell Intern.*

*Corp.*, 580 F. Supp. 2d 1071, 1132 (D. Colo. 2006) ("Market research that includes interviews

with market participants is a common component of a study regarding valuation of an

environmentally impaired property, . . . and so the results of these interviews are 'of a type

reasonably relied upon by experts' in this field.").

   Professor Begay conducted these interviews for the purpose of gaining a deeper

understanding of the extent to which the declination – and RNSB's consequent inability to

assume control over certain health care services – caused non-economic harm.  Interviewing the

affected community is surely the most reliable way that a researcher can begin to answer this

question.  Professor Begay employed the methodology of triangulation to check the accuracy of

his results, which is accepted in social science fields.  Defendants' arguments regarding

Professor Begay's failure to consult additional objective sources go to the weight, rather than the

admissibility, of Professor Begay's testimony.

   The Court now turns to Defendants' arguments regarding the unhelpfulness of Professor

Begay's testimony.  The Court will address Defendants' argument regarding the distinction

between Plaintiff RNSB and the greater Ramah Navajo community in Section C, "RNSB's

Ability to Collect Damages on Behalf of the Ramah Navajo Community," *infra* pp. 39-41.  The

fact that Professor Begay did not attempt to quantify the damages does not render his opinion

unhelpful.  Like in countless other cases involving intangible damages, Plaintiff chose to leave

the determination regarding the measurement of damages to the trier of fact.  *See*, *e.g.*, *United*

*States v. CB & I Constructors, Inc.*, 685 F.3d 827, 837 (9th Cir. 2012) (damages upheld for

environmental harm caused by negligent setting of wildfire even though government failed to "elicit any testimony that put a dollar amount" on the harm); *see also* UJI 13-1807 NMRA ("The guide for you to follow in determining compensation for pain and suffering, if any, is the enlightened conscience of impartial jurors acting under the sanctity of your oath to compensate the plaintiff with fairness to all parties to this action.").  Finally, the Court disagrees with Defendants that Professor Begay failed to account for other factors contributing to the social problems suffered by the Ramah Navajo community.  Professor Begay acknowledged those problems, and noted that the declination at issue exacerbated already troublesome social conditions in Ramah.

For these reasons, the Court finds that Professor Begay's testimony was reliable and helpful.  The Court will consider Professor Begay's testimony in its entirety, affording each portion of the testimony appropriate weight according to its usefulness in making a final determination with respect to intangible damages.

### 3.    Testimony of Peterson Zah

Defendants argue that Mr. Zah was not qualified to render an expert opinion as to damages in this case because he lacks expertise in economic development or health care.  They argue that his opinion is unreliable, because rather than conducting an independent inquiry into the impact of the contract declination, he "relied almost exclusively on his interviews of members of the Ramah Navajo community, the very individuals who stand to benefit from any damage award in this case."  Doc. 117-1 at 9.  Defendants argue that Mr. Zah relied unquestionably on the hearsay statements of community members and failed to identify a methodology to form his opinion.  Finally, Defendants argue that Mr. Zah's opinion is unhelpful

because he did not attempt to isolate the harms attributable to the contract declination from those already in existence notwithstanding the declination, nor did he attempt to quantify the harms.

Defendants' arguments evidence an overly narrow approach to assessing the qualifications of an expert witness. To render an expert opinion, Mr. Zah need not have expertise in every field that impacts the damages calculation in this case. Just as Defendants' expert economist's lack of experience in Native American culture and history did not render his opinion concerning damages unreliable or unhelpful, Mr. Zah's lack of expertise in economics and health care does not undermine his wealth of knowledge about Native American history and culture, particularly in the area of self-determination.

Nor does the Court agree with Defendants' contention that Mr. Zah's testimony was unreliable because he failed to account for factors apart from the declination that contributed to negative conditions in the community. He never claimed that the declination was the sole or even the primary factor causing social and cultural erosion in the community. In his expert report, he states that since 1970,

> [t]here was always a sense of pride and optimism that could be felt in the [Ramah Navajo] community, but when I returned to Ramah in January and February of 2012, I became concerned about the attitude held by many of the community members. The community that I knew over three decades ago had changed, where it once was close and working together I now viewed and felt it was disconnected. After seeing and hearing from several community members *there is no doubt these shifts can partly be attributed to overall social and cultural change*.

Doc. 117-2 at 19 (emphasis added). Mr. Zah goes on to compare the Ramah and Rough Rock communities: "In 2012 Rough Rock continues to be successful while Ramah Navajo is in dire straits. Why did this happen? In my opinion, Ramah Navajo's distance from the larger lands

and community structure of the Navajo Nation is taking its toll." *Id.*  After discussing these two

substantial factors, Mr. Zah focuses on the declination:

> Today we also see another assault on the community spirit with the recent attack
> on community health.  Ramah's Pine Hill Clinic was denied their tribal shares of
> funding from 2007 to 2011.  It negatively affected the whole community and
> caused decreased pride, an erosion of trust between people, and created an
> increase in a sense of hopelessness.

*Id.*

Although Defendants are correct that Mr. Zah did not attempt to isolate the harms

attributable to the declination and place a dollar value on them, he also did not blame the Ramah

Navajo community's problems entirely on the declination.  Rather, he provided a historical

background for the context in which Defendants declined the contract proposal.  In Mr. Zah's

expert report, he concludes that the declination had a real and negative effect on the Ramah

Navajo community, focusing primarily on the fact that, due to the lack of funding, the clinic was

unable to provide certain mental and behavioral health services.  During this time that the

community lacked these services, between 2007 and 2011, five young people committed suicide.

The Court does not believe, nor did Mr. Zah suggest, that the declination was the sole cause of

these suicides.  Rather, the theme that ran throughout his testimony was that IHS ignored its

mission to support the Ramah Navajo community, and instead engaged in actions that further

exacerbated the already existing problems.

Although Defendants suggest that Mr. Zah gathered his information only from self-

selected community members, he specifically states that he interviewed Pine Hill Clinic staff.

*See* Doc. 117-2 at 20.  Regardless, interviewing community members is an important component

of social science research going to the particular question with which Mr. Zah was tasked: how

did the declination at issue, and RNSB's resulting inability to assume control over various health care services, cause intangible harms?  For further discussion on Defendants' argument regarding Mr. Zah's reliance on interviews with community members, as well as the absence of any analysis isolating or quantifying the harms, *see* Section 2, *supra*, which addressed these arguments as they pertain to Professor Begay.  Like with Professor Begay's testimony, the Court finds that Defendants' arguments go primarily to the weight, rather than the admissibility of Mr. Zah's testimony.  His opinion testimony satisfies the standards set forth in Rules 702 and 703, as well as *Daubert*, and the Court will consider the testimony in its entirety.

### C.  RNSB's Ability to Collect Damages on Behalf of the Ramah Navajo Community

The Ramah Navajo Chapter is "officially recognized and certified as a political unit of the Navajo Tribal government."  Pl.'s Ex. 61 at 4.  RNSB is a non-profit organization made up of all adult members of the Ramah Navajo community.  At RNSB's founding, the Navajo Nation as well as the Ramah Navajo Chapter sanctioned RNSB to run education, health and community programs for the Ramah Navajo community.  In 1975, the Chapter delegated to RNSB its responsibility to provide health care services for the Ramah Navajo community, and reaffirmed this delegation in 2006.  Pl.'s Ex. 61 at 3-4.

Drawing a distinction between the tribe and the plaintiff in this case is complicated. Evidence presented at the hearing demonstrated that the school board is comprised of the entire Ramah Navajo adult population.  Additionally, the Ramah Navajo Chapter created RNSB as a government body for the purpose of tending to the health and educational needs of the community.  As Plaintiff's entire purpose is to meet the community's needs in those regards, it is

overly simplistic to attempt to entirely separate the Ramah Navajos as a community from the school board as a non-profit corporate entity.

Keeping in mind that RNSB is an arm of the tribal government, it is important to begin this inquiry, once again, with the overarching goals of the ISDA. Although the ISDA institutes a system of contracting to tribal government agencies, the Act's purpose is to transfer control of programs from the federal government to "the Indian people." 25 U.S.C § 450a(b). The Act aims to do this by "supporting and assisting Indian tribes in the development of strong and stable tribal governments." *Id.* It is implicit in the language of ISDA that the improvement of any given Indian community may be achieved by strengthening its governing bodies. In this regard, the ISDA directs the Secretary to contract with any "tribal organization" or "tribe" that requests a contract by tribal resolution. 25 U.S.C § 450f(a)(1). "Tribe" is defined as "any Indian tribe, band, nation, or other organized group or community, . . . which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." *Id.* at §450b(e). As noted above, the Ramah Navajo Chapter sanctioned RNSB to assume the role of contractor with the federal government pursuant to the ISDA. It is clear that RNSB fits the ISDA's definition of "tribe," as the federal government has maintained various contracts with RNSB since the 1970s.

Accordingly, RNSB and the Ramah Navajo tribe, or community, are essentially synonymous. RNSB suffered harm due to Defendant's declination precisely because RNSB embodies the community as a whole. Nonetheless, the Court wishes to stress that many of the harms Plaintiff's witnesses described impact individual community members more acutely than the community as a whole. The Court will not analyze how these harms impacted specific

40

individuals, but rather will base its decision on the impact they had to the larger community and, in turn, RNSB.

## II.     Appropriate Measure of Damages

### A.     General Legal Principles Regarding Damages

This case presents a novel category of damages which shares some characteristics with contract damages and others with tort damages.  Contract damages come into play when a contract is breached, which did not occur in the instant case.  However, suffice to say that the law of contracts does not contemplate circumstances such as these, when Congress mandates a federal governmental agency to enter a contract, and the agency defies that mandate for years in violation of a court order.  Defendants' actions in this case are more in line with tort, whose "essence . . . is the defendant's potential for civil liability to the victim for harmful wrongdoing and correspondingly the victim's potential for compensation or other relief."  ROBERT THOMPSON ET AL., REMEDIES: DAMAGES, EQUITY, AND RESTITUTION 50 (4th ed. 2009) (quoting D. DOBBS, THE LAW OF TORTS (2000)).

Regardless of the precise category, "the point of an award of damages, whether it is for breach of contract or for a tort, is, so far as possible, to put the victim where he would have been had the breach or tort not taken place."  *Miss. Chemical Corp. v. Dresser-Rand Co.*, 287 F.3d 359 (5th Cir. 2002) (quoting *Chronister Oil Co. v. Unocal Refining and Marketing (Union Oil Co. of California)*, 34 F.3d 462, 464 (7th Cir. 1994) (Posner, C.J.)).  In engaging in this analysis, the Court is mindful that

> [t]he sole object of compensatory damages is to make the injured party whole for
> losses actually suffered; the plaintiff cannot be made more than whole, make a
> profit, or receive more than one recovery for the same harm . . . .  [T]he law will
> not put him in a better position than he would be in had the wrong not been done
> or the contract not been broken.

22 Am. Jur. 2d *Damages* § 28 (2012) (citations omitted).

Plaintiff bears the burden of proving damages with reasonable certainty.  24 Williston on Contracts § 64;8 (4th ed. 2012) (citation omitted); Rest. 2d Torts § 912 (1979).  "Reasonable certainty" does not require Plaintiff to prove its damages with mathematical precision.  *Sauer v. Burlington Northern R.R. Co.*, 106 F.3d 1490, 1494 (10th Cir. 1996).

In light of Plaintiff's request for intangible damages, the Court is guided by the firm principle that

> a defendant is liable only to the extent that his or her own acts have caused an injury . . . .  [S]eparate wrongs done by independent agents cannot be joined together to increase the responsibility of one of the wrongdoers, notwithstanding any difficulty there may be in determining what part of the injury or loss was the result of the acts or omissions of the defendant, and what part was the result of other causes.

22 Am. Jur. 2d *Damages* § 30 (2012) (citations omitted).  Nonetheless, "the difficulty of separating the damage caused by one party from the damage caused by the act of some other party cannot defeat a recovery."  *Id*.  Plaintiff's claim will not fail simply due to its inability to precisely apportion its injuries to the declination, as opposed to preexisting social conditions affecting the community.  *See Sauer*, 106 F.3d at 1494 ("The extent to which an injury is attributable to a preexisting condition or prior accident need not be proved with mathematical precision or great exactitude. The evidence need only be sufficient to permit a rough practical apportionment . . . .  When there is evidence that defendant's negligence aggravated a preexisting condition but expert testimony does not precisely apportion the injury, apportionment is an issue for the jury.").  In such a case, it is the duty of the trier of fact to make the best estimate in its

power to base its damages calculation on the actionable injury itself.  22 Am. Jur. 2d *Damages* §
30 (2012).

### B.      Damages Theories Applicable to the Instant Dispute

With respect to the instant dispute, Defendants have continuously advanced the theory
that "any money damages awarded under the ISDA must be awarded in accordance with
ordinary principles of contract law."  Doc. 136 at 4.  The Court finds this puzzling, as no one
involved in this dispute submits that a breach of contract occurred between the parties.
Defendants argue that Plaintiff's theory of damages, wherein it relies on analogy to civil rights
statutes and tort law, is unjustifiably expansive.  While the Court agrees that certain aspects of
Plaintiff's damages claim are unfounded – which the Court will address in Sections III,
"Tangible Damages," and IV, "Intangible Damages," *infra* – it cannot agree with Defendants that
the legal principles to be applied to the Court's damages calculation should be limited
exclusively to those that govern breach of contract actions.  It may be difficult to pinpoint a
precise theory of damages that will govern these novel circumstances, but the Court finds
Plaintiff's analogies helpful.  The Court would also note that most jurisdictions recognize an
independent tort action for interference with a contract, which applies to disputes that commence
with the formation of a contract, yet a party's actions in interference with that contract bring the
legal action outside the realm of contract law.  This illustrates the Court's belief that the fact that
a proposed and declined contract forms the basis of this lawsuit does not compel the conclusion
that only contract law applies to the question of an appropriate remedy.

Contract law imposes liability for a contractual breach even if the breaching party was
not at fault and made every possible effort to perform.  In contrast, under general principles of

43

tort law, one can cause terrible injury to a victim but will be liable only if he or she is at fault in some way. ROBERT THOMPSON ET AL., REMEDIES: DAMAGES, EQUITY, AND RESTITUTION 51 (4th ed. 2009) (quoting D. DOBBS, THE LAW OF TORTS (2000)).  Given these principles, reference to tort law is necessary in the instant case.  This dispute involves a tribal organization that sought to contract to provide services to tribal members under a statutory scheme designed to "assur[e] maximum Indian participation in the direction of . . . services to Indian communities so as to render such services more responsive to the needs and desires of those communities."  25 U.S.C. § 450a(a).  It also involves a governmental agency whose mission is "to raise the physical, mental, social, and spiritual health of American Indians and Alaska Natives to the highest level," and which "recognizes that tribal leaders and members are in the best position to understand the health care needs and priorities of their communities."  INDIAN HEALTH SERVICE, http://www.ihs.gov (last visited Dec. 4, 2012).  Yet notwithstanding the ISDA's directive and IHS's own mission, for nearly three years the agency ignored the Court's February, 2008 mandate to enter a self-determination contract with RNSB.  Although this dispute does not involve a contractual breach, it involves inexcusable conduct on the part of IHS that directly harmed RNSB, which makes reference to tort law appropriate.

Defendants argue that Congress's use of the phrase "contract disputes and claims," *see* 25 U.S.C. § 450m-1, indicates that only traditional contract remedies are available.  The trouble with this argument is that the entire premise of the Court's decision to hold a hearing as to damages was that Congress did not anticipate the circumstances that merit a damages award in this case.  Congress surely assumed that once a court ordered injunctive relief pursuant to the ISDA's remedial provisions, the federal government would respect such an order.  Congress

certainly did not anticipate that nearly three years would elapse before the government would agree to follow a court order, in the meantime leaving the tribe without funding to assume control over the programs the ISDA entitles it to run.  The fact that Congress chose the phrase "contract disputes and claims," rather than "claims involving wrongful and protracted declinations of contracts" only illustrates Congress's reasonable assumption that the government's continued refusal to follow a court order to correct a wrongful declination, would not be so commonplace as to require its own separate remedial scheme.

In summary, the Court indeed agrees with Defendants' contention that "any damages in this action are limited to those that are a provable consequence of the contract declination."  Doc. 136 at 15.  Yet in making this determination, the Court may seek guidance from appropriate principles of both contract and tort law, as Defendants' actions in this case are analogous to tortious conduct.

### C.    Bad Faith

The parties have advanced opposing arguments regarding the relevance of Defendants' alleged bad faith on the damages calculation in this case.  Specifically, the parties dispute the relevance of the state of mind of IHS representatives during their negotiations and discussions with Plaintiff that culminated in the declination of the contract.  The Court finds that it is not necessary to resolve this question, because Plaintiff failed to demonstrate that IHS acted in bad faith.  Plaintiff proffered testimony of various individuals who suspected that IHS treated Plaintiff unfairly due to RNSB and the Ramah Navajo Chapter's history of lawsuits against the government. Plaintiff also advanced a theory that the entire structure of IHS – whose employees' goal is "to contract themselves out of a job," Doc. 132 at 76:6-7 – creates an inherent conflict of

interest and an incentive for IHS employees to mistreat tribes.  However, Plaintiff did not offer

evidence to support its theory nor its witnesses' suspicious, and this speculative testimony does

not establish that IHS acted in bad faith.

## III.     Tangible Damages

As summarized above, basic principles of both contract and tort damages espouse an

objective of placing the plaintiff in the position it would have been in had the injury at issue not

occurred.  The objective, in other words, is to make the plaintiff whole.  As the Court made clear

in its September 28, 2011 Memorandum Opinion and Order, Plaintiff will not be made whole by

a simple mathematical exercise of totaling the tribal share and contract support cost funds for

each year at issue.  In certain respects, this approach would make Plaintiff "more than whole,"

*see* 22 Am. Jur. 2d *Damages* § 28 (2012), as Plaintiff did not in fact expend its own resources in

the precise amounts of the wrongfully declined contract.  Yet in other respects, this overly

simplistic approach would be inadequate, as it does not account for intangible harms.  In this

section, the Court will focus on the proper method for calculating tangible damages.

### A.      Tribal Shares

The parties disagree as to the quantity of tribal shares at issue.  Resolution of this conflict

requires the Court to establish the relevant time period.  Although the Court initially framed the

relevant time period as commencing as of the Court's reversal of Defendants' declination,

briefing submitted prior to the hearing, and the evidence presented at the hearing, demonstrates

that the time period at issue began with the wrongful declination.  More specifically, the relevant

time period commenced on the date that the contract of 2007 would have gone into effect.

Plaintiff's contract proposal was declined on January 12, 2007.   The Court reversed this declination on February 6, 2008.  Had the contract been awarded at the outset, Plaintiff would have begun receiving tribal shares as of January 15, 2007.  *See* Doc. 132 at 58:10.  Therefore, the total amount of tribal shares for 2007 through 2010 would have been $1,356,986, a number derived from the testimony of John Tafoya.  *See* Doc. 132 at 63:7.  The Court is not persuaded by Plaintiff's alternative interpretation of the numbers, which is based on its reading Mr. Tafoya's ambiguous deposition testimony.  According to his evidentiary hearing testimony, neither the period from January 1-14, 2007 nor December 1-31, 2010, would factor into the calculation.  *See* Doc. 132 at 58:4-59:21.  However, this calculation is not the end of the story.

### 1.     The Parties' Positions

Throughout this litigation, Plaintiff has contended that it is entitled to recover the full amount of tribal shares because Defendants had a statutory duty to award Plaintiff those shares. In response, Defendants have argued that Plaintiff is entitled to *none* of the tribal shares because IHS used the funds at issue to continue to provide services at the Zuni Hospital.  Plaintiff responds that the services available at the Zuni Hospital are irrelevant.  RNSB reasons that these services were inadequate because the hospital is situated roughly 50 miles, and a one- to one-and-a-half-hour drive, from the residences of most Ramah Navajos.  *See* Doc. 123 at 149:22-150:5 & 43:9-13.

The Court finds both parties' arguments to be flawed, and stated this conclusion clearly in its September 28, 2011 Memorandum Opinion and Order.  *See* Doc. 99 at 11 (disagreeing with the "all-or-nothing approach" of whether RNSB was entitled to nothing or the full contract amount).  For this reason, the Court held a hearing to determine how it could quantify "both the

concrete harms, as well as those harms that are less tangible, that Plaintiff suffered due to its inability to take control over the provision of health care services to tribal members." *Id*. at 12. Although it is evident from the hearing testimony that RNSB indeed suffered damage due to the wrongful declination, Plaintiff did not provide the Court the information it would have needed to accurately follow the elementary principle of measuring damages: making the injured party whole.  As Plaintiff did not meet its burden in this respect, the quantity of damages the Court will award Plaintiff, based on the evidence presented, will be insufficient to make RNSB whole.

## 2.    Limitations of Plaintiff's Evidence

At the hearing, RNSB continued to take the position that it was entitled to the entire contract amount, as Defendants had a statutory duty to award the contract.  However, RNSB did not present evidence that it actually spent $1,356,986 of its own resources that it would have been able to apply towards other programs if the contract had been awarded.  Therefore, under basic principles of damages, this amount would be excessive to make Plaintiff whole.

Yet the evidence did show that the Pine Hill Clinic is in significant need of improved equipment and programs, which it would have been able to provide had IHS allocated the tribal shares at issue in this litigation.  For example, Carolyn Finster discussed how the various pathologies plaguing the community relate directly to a lack of medical care: high rates of substance abuse, diabetes, and suicide demonstrate that the community would benefit from prevention efforts, but the clinic cannot afford the staff to conduct such prevention.  Ms. Finster also testified that the Pine Hill Clinic has one piece of donated x-ray equipment, which is seventeen years old.  She further testified that radiology equipment should be replaced every seven years.  She stated that the community needed more psychiatric and psychological services,

48

noting the clinic had only one part-time psychiatrist and no psychologist.  She also noted that the clinic would like to institute a physical therapy department.  She stated that the clinic needed to upgrade its radiology and x-ray equipment and hire an x-ray technician, noting that at present x-ray services are available only in Zuni, and highlighting instances when patients with broken bones had to travel over rough roads to the Zuni Hospital.  She highlighted the general insufficiency of space under which the clinic operates: it does not have supply storage space, it does not have enough space to have a separate exam room for ultrasounds, and the pharmaceutical products no longer fit on their shelves.  Ms. Finster then discussed a federal mandate for the clinic to adopt an electronic system for keeping health records, which she estimated would cost up to one million dollars.  In fact, the clinic has already begun using its reserve funds to create an electronic system for its dental records.  Ms. Finster further highlighted a foundation problem which she estimated would cost $100,000 to repair.

Unfortunately, Ms. Finster's testimony did not evidence any substantial research on the clinic's part as to the costs of fixing the foundation or creating an electronic records system.  Ms. Finster simply provided rough estimates of $100,000 and $1,000,000, respectively, and did not explain how she arrived at those numbers.  Regardless, Plaintiff failed to elicit testimony from Ms. Finster that, had the contract been awarded, the clinic actually would have fixed its foundation problem and/or begun to upgrade its records system.  Nor did Ms. Finster provide estimates for the costs of an x-ray machine, hiring a psychologist, instituting a physical therapy program, or any of the other items she listed among the clinic's needs.  Without any concrete numbers, the Court is unable to determine how RNSB would have spent the funds at issue, a

49

determination that would be necessary in order to place Plaintiff in the position it would have been in had the contract been awarded.

### 3. Availability of Services at the Zuni Hospital

Yet another factor clouding the Court's inquiry into the correct amount of damages is the fact that, during the relevant time period, any health care services Ramah Navajo tribal members needed were indeed available to them at the Zuni Hospital. The Court agrees with counsel for Defendants that "services provided at Zuni are relevant to the damages calculation," even though they did not obviate "Ramah Navajo School Board['s] . . . need for funds." Doc. 123 at 165:14-17. The services at Zuni Hospital were inferior in certain respects – which the Court will discuss shortly – to services that RNSB would have provided at the Pine Hill Clinic had it had the funds to do so. However, the services available at the hospital were certainly worth *something* to Plaintiff.

To once again state the obvious, this case arises under the Indian Self-Determination Act, whose purpose is "to respond to the strong expression of the Indian people for self-determination by assuring maximum Indian participation in the direction" of health care and other services. 25 U.S.C. § 450a(a). IHS itself acknowledges that it is in all parties' best interests for RNSB to provide the maximum amount of health care services possible, so as to minimize Ramah Navajos' need to access federal government health care services at the Zuni Hospital. *See*, *e.g.*, Testimony of John Tafoya, Doc. 132 at 76:6-7 ("the whole purpose of IHS is to contract themselves out of a job."). Nonetheless, the Pine Hill Clinic does not provide every type of ambulatory health care service available at the hospital, nor has Plaintiff claimed that it would have done so had it received the contract at issue in this case. Accordingly, Ramah Navajos

inevitably depend to some extent upon ambulatory services at the hospital.  Still, during the
relevant time period, Ramah Navajos comprised a very small percentage of the patient
population at the Zuni Hospital, and the causes for this are complex.  In addition to the
availability of, and preference for, services at the Pine Hill Clinic, the quality of services at the
hospital as well as the hospital's distance from the Ramah Navajo reservation are both factors
that deterred Ramah Navajos from seeking medical services there.  Both of these elements are
crucial to the Court's damages calculation.

While hospital services were available to the Ramah Navajos, just as they were available
to any Native American or Alaskan Native in the United States, the hospital's distance was a
significant hurdle that stood in the way of Ramah Navajos receiving the care they needed.  This
is evident in the data the parties presented regarding the number of Ramah Navajo patients who
receive care at the Zuni Hospital.

Unsurprisingly, the parties presented different sets of data regarding the Ramah Navajo
patient population at the Zuni Hospital.  Whereas Defendants' numbers appear to show that
Ramah Navajos receive roughly 45% of their health care services at the hospital, Plaintiff's
numbers show that only 6.27% of the patients at hospital are Ramah Navajos.  *See* Def.'s Ex. D
& Pl.'s Ex. 22.  Neither of these numbers tells a complete story.  Defendants' data relies on the
IHS category of "active user" for any given year, which is defined as a Native American patient
who accessed care at an IHS facility within the last three years.  Doc. 132 at 7:7-11.  When
Plaintiff's counsel asked Ms. Othole to explain why the hospital counts patients in terms of
active users rather than patient visits, her answer was circular:

> Q: In year one of the three years, the hypothetical is that a Native American from
> far away happening to be visiting in the area has a toothache and comes to Zuni

Hospital one time, and never again for the next two, three years.  That person would be listed here as one of the people who is an active user, is that right?

A: Yes.

Q: Doesn't it stand to reason, then, Ms. Othole, that the better measure of the quantity of services performed for Ramah Navajos at the Zuni Hospital facility would be the number of patient visits that they make?

. . .

A: [No, b]ecause active users are the number of individuals that come through to access care.  That's how Indian Health Service, I guess, funds facilities, by active users.

Doc. 132 at 22:25-28:20.  Ms. Othole's testimony demonstrated that an individual who received health care services at the Zuni Hospital once in 2007 but never again, would be an active user for 2007, 2008 and 2009.   Therefore, Defendants' data show that 45% of Ramah Navajos received health care services at the Zuni Hospital at least once every three years between 2007 and 2011.  In this sense, Defendant's numbers portray an inflated image of the number of Ramah Navajos accessing services at the hospital.

In contrast, Plaintiff's data showing that Ramah Navajos comprise only 6.27% of the patient population would suggest that an alarmingly small number of Ramah Navajos actually seek medical care at the Zuni Hospital.  Yet Plaintiff's numbers are also misleading.  It is undisputed that the Zuni population is substantially larger than that of the Ramah Navajo, so it would logically follow that the hospital serves more Zunis than Ramah Navajos.   Although Plaintiff failed to highlight data regarding the precise population count for the Ramah Navajo and Zuni Pueblo tribes, Carolyn Finster estimated that the Ramah Navajo population is 4,000 and the Zuni population is 10,000.  Doc. 123 at 29:9-10.  Bennie Cohoe provided the same estimate as to the Ramah Navajo population.  *Id*. at 151:16-17.  These estimates went unchallenged on

cross-examination.  From these numbers, the Court concludes that Ramah Navajos comprise 28.5% of the total population serviced by ZRSU.  Therefore, Ramah Navajos are accessing services at the Zuni Hospital at slightly over one-fifth the rate that they would be if they accessed these services proportionate to their population.

The reasons for the Ramah Navajos' underrepresentation in the Zuni Hospital patient population are complex. It should first be noted that their reduced representation is due in part to the success of self-determination efforts in Ramah – tribal members are able to take advantage of the many outpatient health care services the Pine Hill Clinic offers.  However, the fact remains that Defendants denied RNSB the opportunity to expand those services, so certain outpatient services remained available only at the Zuni Hospital.  The meager percentage of Ramah Navajo patients demonstrates that the rate at which they accessed these services was disproportionately low.

The distance, compounded by the poor and often impassable road conditions, is certainly a significant factor deterring Ramah Navajos from seeking health care services at the Zuni Hospital.  The quality of the hospital's services – or at least the Ramah Navajos' perception of the quality of services – is another factor.  Although this was at issue in this litigation, the Court does not believe that the anecdotes Plaintiff provided at the hearing were sufficient to support a conclusion about the objective quality of care one receives at the Zuni Hospital.[7]  Nonetheless, it became clear to the Court that many members of the Ramah Navajo community share the sentiment that they do not receive adequate services at the Zuni Hospital.  This sentiment is based not only on experiences with medically inadequate care in the obvious sense, but also with inadequate care due to cultural and language barriers.

---

[7] For this reason, the Court has declined to consider the testimony of Priscilla Kaye in its damages calculation.

Peterson Zah, Plaintiff's expert on the topic of intangible damages, offered testimony that aided the Court in understanding how these cultural issues affect the tribal shares calculation. Mr. Zah first used the Navajo and Hopi nations as an example of two tribes with a long history of conflict, "even before the coming of the white man." Doc. 131 at 190:2-3. Although the source of the conflict is complex, he noted that the two nations have different languages, cultures and lifestyles. He stated that this dynamic exists between the Zuni and Ramah Navajo people as well, and criticized the notion of some that the two tribes' geographical proximity and relatively small populations should make them able to happily share a medical facility. More specifically, he criticized the naïve position of the federal government that it can apply a one-size-fits-all model for Native American health care throughout the country. He stated that "there's a problem with Indian Health Service thinking that, Well, if we give our money to Zuni, Navajos can always get full services there without any kind of ill feelings." Doc. 131 at 190:19-22.

While the Court would have appreciated more detailed and specific testimony on the tensions between these two peoples, this general information that Mr. Zah provided helped the Court to understand the relative weaknesses in Dr. Neuberger's strictly economic approach to the question of damages. Dr. Neuberger opined:

> There may be issues about cultural differences between the Zuni and the Ramah. But if those services were available, they're largely substitutes. As a matter of economics, they may reflect similar provision of health care services in both environments. If that's the case, it's not clear that any of those tribal shares should be a relevant element of damages.

Doc. 132 at 107: 18-25. On cross-examination, counsel for Plaintiff challenged Dr. Neuberger's assumption "that culture and language have no place at all in economic analysis[.]" Doc. 132 at 126:5-6. Dr. Neuberger responded that these factors are relevant to the extent that they can

affect economic conditions.  Similarly, as noted above, when the Court asked for Dr.

Neuberger's opinion regarding damages to which an economic value cannot be attributed, he

stated that this question went beyond his expertise.  *See* Doc. 132 at 147:25-148:1.  These

portions of Dr. Neuberger's testimony highlight his generally narrow approach to identifying

those factors which are relevant to the damages calculation.

      Notwithstanding the handful of Navajo employees at the Zuni Hospital – who make up

no more than five percent of the employee population, and only one of whom is a trained Navajo

interpreter[8] – the evidence Plaintiff presented demonstrated to the Court that Ramah Navajos feel

like outsiders when they visit the Zuni Hospital.  Bennie Cohoe's testimony demonstrated that at

least on occasion, hospital staff members have treated the Ramah Navajo as such.  Whether this

sentiment can be boiled down to an objective truth is unclear, but the fact that the sentiment was

so widespread makes it relevant to assessing the quality of care Ramah Navajos received.

Plaintiffs did not quantify, nor could they have, the precise difference between the quality of

health care services the Ramah Navajo community received at the Zuni Hospital, in comparison

to what they would have received had the services been available at the Pine Hill Clinic.  What is

clear is that the Ramah Navajos should have been receiving increased services at the Pine Hill

Clinic, but such services were not available due to Defendants' wrongful declination.

      In conclusion, some combination of the quality of care – which includes cultural

considerations – and the distance required to travel to the Zuni Hospital, deterred Ramah

Navajos from accessing care there.  As difficult as it is to quantify, in dollar terms, the reduced

---

[8] Jean Othole testified that the Zuni Hospital employs 200 people, seven to ten of whom are Navajo.  Of these, four speak the Navajo language, but they are not trained interpreters.  The hospital utilizes one on-call Navajo interpreter. Doc. 132 at 13:3-19 & 21:22-22:7.

health care services the community received due to these two factors, the Court believes that this disparity should guide the damages calculation with respect to tribal shares.

### 4.      Fund Balance

Finally, Defendants have argued that RNSB retained an excessively large fund balance, which suggests that the clinic would not have effectively utilized additional funds, had the contract been awarded.  Defendants state that a history of mismanagement, combined with an unusually large fund balance, strongly indicate that any additional money simply would have been lumped in with that balance.

Bennie Cohoe, who served as chair of the Navajo Nation Budget and Finance Department and oversaw a $500 million budget, testified as to the fund balances.  He explained that in his service with the Budget and Finance Department, as well as his current position as CEO of RNSB, funds from other entities – including the federal government and ZRSU – have routinely arrived late.  He provided examples of how budget shortfalls have required RNSB to allocate reserve funds to programs that should have been funded through other sources.  He testified that, were it not for the fund balance, RNSB would have had to curtail or eliminate services.  He referred to different years' budgets to illustrate the ways in which the reserve money proved to be crucial, as the fund balance dropped substantially due to the clinic's spending of reserve funds.  Ultimately, Mr. Cohoe concluded that Plaintiff's exhibits demonstrate that the Pine Hill Clinic's retention of the reserve funds was necessary because the clinic's IHS contracts did not produce sufficient revenue to maintain the level of services provided.

During Mr. Cohoe's cross-examination, Defendants pointed to the 2010 audit report's findings that RNSB had inadequate financial oversight.  *See* Pl.'s Ex. 12 at 48-50.  The auditor

56

concluded that RNSB's records "indicated a total failure by the Controller and Director of Administrative Services to provide cash reports, budget analysis, financial statements or written reports on financial matters requiring corrective action." *Id*. at 48.  It further concluded that only finance staff had the opportunity to discuss the auditing process, and the RNSB Board of Trustees did not have adequate opportunity to meet with the auditor.  The auditor found that "[b]udgetary control was non-existent," *id*. at 49, highlighting various programs' over-expenditures.  The report emphasized that RNSB maintained excess school funds notwithstanding its declining school enrollment, and concluded that the failure to provide the Board of Trustees the opportunity to budget these funds "indicates a failure to fulfill job responsibilities by the Controller and Director of Administrative Services." *Id*. at 50.  Mr. Cohoe largely agreed with these assessments, and in fact stated that he had personally brought the deficiencies of the comptroller to the attention of the auditor.  Since the release of the 2010 audit report, that individual lost their employment with RNSB.

Dr. Neuberger also highlighted Plaintiff's reserve funds, suggesting that they may have been excessive.  He highlighted the audit report's findings and stated that, while it is prudent for any organization to maintain reserve funds, RNSB's funds may have been larger than necessary to cover contingencies.  He noted the auditor's opinion – but did not adopt it as his own – that a five percent reserve should have been adequate.  He stated that "it's relevant that [the reserve funds] were spent down," but maintained that he "would need more data to confirm whether that was simply a replacement for the tribal shares that weren't granted, or financial mismanagement, or any other explanation."  Doc. 132 at 109:24-110:3.

In contrast to Dr. Neuberger's testimony, Carolyn Finster stated that a five percent reserve would not be adequate to cover even monthly operating coats.  As an example, she stated that such a reserve would not allow the clinic to meet its payroll, nor pay its pharmaceutical bills, which amount to $50,000 per month.  In addition, the clinic faces sporadic congressional rescissions of funds, as well as occasional delayed payments from Medicaid, and these periods of under-payment from other sources require a significant fund balance to cover costs.

In dissecting Dr. Neuberger's testimony, the Court found it helpful to focus on his explanation for why he did not produce his own damages estimate for this case.  He stated: "I was asked [] to subject plaintiff's claim to some economic scrutiny . . . .  I simply wasn't asked to do a damages analysis."  Doc. 132 at 112:17-23.  The Court understands that the defense's job is to undermine Plaintiff's claim such that it fails to satisfy the burden of proof.  Nonetheless, with respect to the issue of reserve funds, Defendant needed to do more than present an expert who parroted the conclusions of the auditor's report.  Mr. Cohoe and Ms. Finster, who have direct experience with the particular budget at issue in this case, gave reasonable explanations for the retention of reserve funds.[9]  While more specifics would have been helpful from Mr. Cohoe, his statement that funds are often unexpectedly reduced or late, along with Ms. Finster's explanation as to the inadequacy of a five percent reserve, satisfy the Court that the reserves were not unreasonably excessive.

---

[9] It is noteworthy that Plaintiff's expert economist, Dr. Miriam Jorgensen, did not offer an opinion regarding the prudence of the size of the clinic's reserve accounts.  Mr. Cohoe and Ms. Finster's distinct experience with the budget challenges facing RNSB and the Pine Hill Clinic suggested to the Court that such testimony is more properly the province of those managing the budget at issue, rather than an expert economist who is unfamiliar with it.

### 5.      Conclusion

After much consideration, the Court concludes that damages for the missing tribal shares shall be awarded as follows:

(1) The full tribal share amount, $1,356,986, shall be reduced according to the availability of services at the Zuni Hospital.  Were these services identical in every way to what the Pine Hill Clinic would have provided, no damages for tribal shares would be due.  However, because the location of the Zuni Hospital was inconvenient (and at times, inaccessible) to the Ramah Navajo community, and because Plaintiff suffered an inability to assume the self-determination and control to which ISDA entitles it, the hospital's services were a poor substitute.  Given the disproportionately low rate at which Ramah Navajos accessed these services during the relevant time period, which may be attributed to the distance and inconvenience of the hospital as well as the perception of inadequacy of care there, the Court will reduce the tribal shares amount by one-third, yielding a total of $904,657.  The Court concludes that this number will appropriately account for the facts that: (a) IHS indeed expended the total tribal shares amount at the Zuni Hospital; (b) Ramah Navajos accessed care at the hospital at only one-fifth the rate they would have had they received services proportionate to their population; and (c) the low representation of Ramah Navajos in the Zuni Hospital patient population is in significant part attributable to successful self-determination programs in Pine Hill.

(2) Having arrived at the sum of $904,657, the Court must strive to accurately make Plaintiff whole by assessing the evidence Plaintiff presented.  The Court has already discussed Plaintiff's failure to provide precise estimates for the costs of services it would have provided,

employees it would have hired, and equipment it would have purchased with the lost tribal

shares.  Accordingly, the Court has arrived at an utmost conservative estimate for the costs of

these items towards which Plaintiff indeed proved it would have directed the funds.  The Court

finds that the evidence Plaintiff presented proves that it would have directed at least forty percent

of this $904,657 towards the items and services on its wish list.  Accordingly, the total damages

for lost tribal shares shall be $361,862.80.

      **B.**     **Contract Support Costs**

To recap, under any self-determination contract, the tribal shares amount is equal to what

the government itself would have spent on "the operation of the programs or portions thereof for

the period covered by the contract."  25 U.S.C. § 450j-1(a)(1).  To supplement tribal shares, the

ISDA requires that contract support costs be awarded to cover "the reasonable costs for activities

which must be carried on by a tribal organization as a contractor to ensure compliance with the

terms of the contract and prudent management," 25 U.S.C. § 450j-1(a)(2), but which "normally

are not carried on by the respective Secretary in his direct operation of the program."  25 U.S.C.

§ 450j-1(a)(2)(A).

The plain language of the statute demonstrates that the purpose of contract support costs

is to cover the expenses a tribe incurs in its performance of its duties under a contract.  In other

words, a tribe cannot incur contract support costs if it never enters a contract with the

government.  Plaintiff has not demonstrated that it is entitled to any CSCs under the wrongfully

declined contract, because it did not incur any of the expenses CSCs are designed to cover.  Just

as the Court found with respect to tribal shares, it is not enough for Plaintiff to show that

Defendants had a statutory duty to award them a particular amount under the wrongfully

declined contract.  Rather, Plaintiff must show that awarding CSCs for the years the parties had

no contract in place would make Plaintiff whole.  Plaintiff has not met this burden.

Contract support costs do remain at issue for December of 2010, when the parties finally

entered a contract, through the present.  As the Supreme Court addressed this precise issue last

term, this Court expects that the government has had the opportunity to formulate a plan for

retroactively funding CSCs under self-determination contracts.  The Court will await further

guidance from the parties as to the issue of CSCs from December 2010 through the present, and

if necessary, will issue a supplemental order to the instant order.

## C.    Third-Party Reimbursements

When patients who have health insurance through public or private insurers receive

health care services at the Pine Hill Clinic, the clinic in turns bills these insurers for third-party

reimbursements, also termed "third-party revenues."  Carolyn Finster explained that these funds

are a significant portion of the clinic's budget, because the money allocated from IHS is

insufficient for the clinic to operate.  Dr. Jorgensen added that Congress accounts for third-party

billing in its IHS appropriations; in this sense, entities such as the Pine Hill Clinic are

deliberately underfunded because they are expected to recover additional revenues from third

parties.  Ms. Finster explained that "huge inflation in health care over the years" has vastly

outpaced the "small inflation" that IHS has accounted for in its budgeting.  Doc. 210 at 38:24-

39:10.  Accordingly, the clinic relies on third-party billing to purchase pharmaceuticals and to

pay staff adequately competitive salaries.  Particularly given the clinic's rural and isolated

setting, it can retain medical staff only if it is able to pay them salaries that are competitive for

61

the region.  Ms. Finster estimated that third-party revenues fund 60 to 70% of the Pine Hill

Clinic's total budget.

As noted above, Dr. Neuberger critiqued Dr. Jorgensen's methodology for estimating lost

third-party reimbursements.  *See* p. 16, *supra*.  He first stated that Dr. Jorgensen's sampling of

three years of data was insufficient, and further noted that various scenarios would not have

produced third-party reimbursements.  Dr. Neuberger's critique of Dr. Jorgensen's use of three

years' worth of data presents another example in which the defense's conclusory statements

criticizing Plaintiff's evidence did not suffice to undermine it.  On cross-examination, Dr.

Jorgensen explained that she used three years' worth of data because that was the data available

to her.  As "the best predictor of the future is the past," Dr. Jorgensen used data from 2007, 2008

and 2009 to "make a best estimate about what that additional income would be that Congress is

counting on the program having as part of its budget."  Doc. 131 at 134:12-21.

The Court is satisfied that Dr. Jorgensen employed a reasonable and satisfactory

methodology for estimating lost third-party reimbursements.  The Court shall accordingly apply

Dr. Jorgensen's ratio of 0.4 to the Court's tribal shares calculation.  This yields a total of

$144,745.12.

### D.    Economic Multiplier

The competing expert economists took starkly different positions regarding the

usefulness and appropriateness of utilizing the BEA's RIMS II multiplier to approximate

additional money that would have flowed through the local economy had Plaintiff received its

proposed contract.  The Court has had trouble reconciling the experts' opinions about the

usefulness of these multipliers.  Whereas Dr. Jorgensen described application of the multiplier as

"[a] standard economic technique," Doc. 131 at 118:10, Dr. Neuberger criticized its application

as "pure speculation."  Doc. 132 at 118:25.  The Court conducted some independent research as

to this multiplier, and found the RIMS II User's Guide (hereinafter "User's Guide") on the

BEA's website.  *See* http://bea.gov/regional/rims/index.cfm; click on "User's Guide" (last visited

Jan. 11, 2013).  RIMS II measures the impact of one industry's production on other industries

using a backward-linkage model, where "an increased demand for output results in an increase in

the demand for inputs."  User's Guide at 2-2.  As applied to the instant case, the model assumes

that the community's need for expanded health care services would lead to the hiring of

additional employees as well as the purchase of additional goods and services that are necessary

for the provision of health care.  It follows that, had the contract been awarded, this increased

economic activity would have manifested in the community in the form of additional local

spending and hiring.

The backward-linkage nature of the model exposes a flaw in Plaintiff's theory, because

Plaintiff failed to show that every dollar under the contract would have become "inputs" as

defined by the BEA.  The hypotheticals the BEA offers in its User's Guide make clear that the

multiplier effect is based on money that is spent on a project, not money that is awarded under a

contract.  In this sense, Plaintiff's methodology of multiplying the entire contract amount by the

Cibola County multiplier is flawed.  An accurate methodology would be to determine what

portion of the funds at issue would have been designated for a particular project or purpose, and

then apply the multiplier to that number. Plaintiff failed to advance concrete evidence

demonstrating how it would have spent the funds, nor did it demonstrate that no portion of the

tribal shares would have entered a reserve account.  Because of this, the Court is unable to calculate the multiplier effect with any reasonable certainty.

The Court does not doubt that RIMS II economic multipliers are a legitimate and accurate methodology for calculating the multiplier effects of increased economic activity in a certain community.  Dr. Neuberger's critique that Plaintiff has not demonstrated that the money would have been spent within the community, is already accounted for in the BEA's calculation of the multiplier.  Moreover, Defendants' argument as to double counting is not particularly persuasive, as the multiplier effect generates increased economic activity at the time of the initial input, and this effect continues over time.

Notwithstanding the legitimacy of the multiplier as a measure of increased economic activity, the Court has two concerns with its application to the instant case.  First, the Court was unable to find a single instance of a federal court employing RIMS II multipliers to the determination of a damages award.  Given the implications a damages award in this case will have on other ISDA actions based upon contract declinations across the country, it would be unwise to award damages according to a multiplier effect without any guidance from other courts.  Secondly, while the benefits of increased economic activity are immediately apparent in a community that suffers from dire poverty and 70% unemployment, the loss of these benefits is quite attenuated from harms directly suffered by RNSB itself due to the declination.  The Court has already explained that RNSB can collect damages on the community's behalf to the extent that harms to the community harmed RNSB.  When the community's health care needs go unmet, this harms RNSB, as its function is to provide for those needs.  However, the same cannot easily be said when the community loses out on the economic growth that would have

64

accompanied increased health care spending.  On balance, the competing experts left the Court

unsure, even after its independent research, as to the appropriateness of applying the RIMS II

multiplier to this case.  As Plaintiff bears the burden of proving its damages, the Court concludes

that Plaintiff has failed to meet its burden and will not award damages under the economic

multiplier theory.

## IV.    Intangible Damages

As the Court explained in its September 28, 2011 Memorandum Opinion and Order, the

hearing in this matter was necessary to determine how the Court could quantify "both the

concrete harms, as well as those harms that are less tangible, that Plaintiff suffered due to its

inability to take control over the provision of health care services to tribal members."  Doc. 99 at

12.  Throughout the course of this litigation, the Court has held a firm conviction that the true

damages in this case are not calculable pursuant to an overly simplistic mathematical summation

of the funds that should have been awarded under the wrongfully declined contract.  Rather, the

most severe form of harm in the instant case is RNSB's inability to expand its autonomy and

control over services to tribal members, and accordingly fulfill the ISDA's objective of self-

determination.

While Plaintiff succeeded in presenting some relevant evidence on the topic of intangible

damages stemming from the contract declination, the Court found the majority of the testimony

to concern matters that were simply too attenuated from the declination to merit a damages

award in this action.  Professor Begay offered incredibly compelling testimony about the

conditions of the Ramah Navajo community and the social pathologies inflicting it.  The Court

nonetheless found his testimony to be insufficiently specific to support a finding that these

pathologies can be linked with any reasonable certainty to the declination.  The Court was also troubled by Professor Begay's unawareness that the contract was indeed awarded over a year prior to his interviews.  While the Court believes that such a prolonged declination could continue to cause harm even after the contract is ultimately awarded, Professor Begay's failure to account for this undermines his findings.

The deficiencies the Court has identified in Professor Begay's research do not entirely vitiate his opinion testimony.  Although Dr. Jorgensen only briefly discussed intangible damages, the Court found that her testimony on the topic of self-governance lent support to Professor Begay's conclusions.  Dr. Jorgensen stated that according to her research, successful self-determination efforts under the ISDA allowed tribes to create programs that were appropriate for their communities, which left the communities "with impressions that they were receiving higher-quality service."  Doc. 131 at 82:5-6.  Examples she gave were: reduced response times to emergency calls when a tribe assumed control of its police department; decreases in waiting time for services; and increased returns on timber from forests on Indian land when tribes managed the sales.  This last example referred to a study by two Harvard economists of 170 harvests from 70 tribes over a three-year period.  *See id*. at 84-85.  The study concluded that a tribe received 4.5% higher prices than the federal government did on "the same bundle of timber."  *Id*. at 85:4.  This study represents a concrete example of Dr. Jorgensen's statement that self-determination has a positive impact even when the service being provided is identical to that provided by the federal government.  Dr. Jorgensen concluded in her own research that "cultural fit and legitimacy," *id*. at 87:20, lead to advancements in economic and community development.

The "impressions" of higher quality care to which Dr. Jorgensen testified assisted the Court in understanding Professor Begay's testimony.  This confirmed for the Court that the notion of damages in a wrongful declination case hinges on economically immeasurable concepts such as the sentiments Dr. Jorgensen described.  While Dr. Begay's testimony lacked adequate concrete examples of how the loss of *hoz'ho* had a negative impact upon morale in the community, Dr. Jorgensen's citation to her own research as well as other studies assisted the Court in understanding the magnitude of this loss of morale.  The sense of hopelessness that Professor Begay described is essentially the converse of the impressions of better service to which Dr. Jorgensen spoke.

To a certain extent, the Court agrees with Defendants' argument that Professor Begay devoted much of his testimony to describing damages that are not solely, or even primarily, traceable to the declination.  However, Professor Begay explained that, in order to carry out his assignment, he had to research the historical context in which the declination occurred.  He aptly described the ways in which the declination exacerbated conditions that were already troublesome in light of overwhelming poverty, substance abuse, mental health problems, and a long history of persecution.

In addition, Professor Begay's work at the Harvard Project on American Indian Economic Development, as well as his magnitude of publications on the topic of tribal economic development, make him more than qualified to testify as to the link between self-determination and tribal success.  After years of research with the Harvard Project, Professor Begay has concluded that "one of the fundamental keys to successful development is self-determination. And if you don't have that, if it's thwarted . . . then the likelihood of success is small to none."

67

Doc. 131 at 36:25-37:5.  He emphasized that the United States embraced a policy of self-determination when it recognized that such a policy was the *only* acceptable and appropriate manner of dealing with Native American tribes.  Following failed federal policies of termination and assimilation – including, particular to the Navajo people, the Navajo livestock reduction and Navajo relocation programs – the government officially recognized that self-determination is the only policy that allows tribal communities to function well.

Professor Begay's testimony highlights the severity of the harm Defendants caused to RNSB.  To recap Defendants' wrongful actions, in response to insufficient congressional appropriations, IHS informed tribes that they needed to waive their right to funding to which they were entitled under the ISDA.  In this case, the funding in question covered services Plaintiff was already providing pursuant to a mature contract, and there is simply no doubt that Plaintiff was entitled to the funds.  Nonetheless, the federal government ignored Congress's mandate to provide the funds – including CSCs – to any tribe that meets the statutory criteria. While it was arguable at the time that the agency's actions were proper under its reading of the statute's language with respect to the availability of appropriations, any arguable justification for IHS's actions became moot when this Court issued its February 6, 2008 Memorandum Opinion and Order.  Following an unequivocal court order to fully fund the contract, IHS continued to refuse to do so for years.  By these actions, Defendants directly thwarted Plaintiff's ability to further its self-determination efforts, defying the will of Congress and even stifling the objective of IHS itself.

The Court cannot even begin to recount the horrors that the United States government inflicted upon Native American tribes over hundreds of years of shameful policies.  However, it

is evident from even a cursory review of this history that the eventual embrace of self-

determination as the appropriate policy for the government's dealings with tribes, came at a great

cost.  It was not until 1970 that self-determination became official policy, at which time

President Richard Nixon issued the following statement to Congress, in a special message on

Indian affairs:

> The first Americans – the Indians – are the most deprived and most isolated
> minority group in our nation.  On virtually every scale of measurement –
> employment, income, education, health – the condition of the Indian people ranks
> at the bottom.
>
> This condition is the heritage of centuries of injustice.  From the time of their first
> contact with European settlers, the American Indians have been oppressed and
> brutalized, deprived of their ancestral lands and denied the opportunity to control
> their own destiny.  Even the Federal programs which are intended to meet their
> needs have frequently proved to be ineffective and demeaning.
>
> But the story of the Indian in America is something more than the record of the
> white man's frequent aggression, broken agreements, intermittent remorse and
> prolonged failure.  It is a record also of endurance, of survival, of adaptation and
> creativity in the face of overwhelming obstacles.  It is a record of enormous
> contributions to this country – to its art and culture, to its strength and spirit, to its
> sense of history and its sense of purpose.
>
> It is long past time that the Indian policies of the Federal government began to
> recognize and build upon the capacities and insights of the Indian people. Both as
> a matter of Justice and as a matter of enlightened social policy, we must begin to
> act on the basis of what the Indians themselves have long been telling us. The
> time has come to break decisively with the past and to create the conditions for a
> new era in which the Indian future is determined by Indian acts and Indian
> decisions.

Richard Nixon, *Special Message to the Congress on Indian Affairs* (July 8, 1970), THE

AMERICAN PRESIDENCY PROJECT, http://www.presidency.ucsb.edu/ws/?pid=2573.

Through their actions in the instant case, Defendants disregarded the long and painful

history that ultimately – and far too late – culminated in the federal government's recognition of

the importance of Indian self-determination.  While it cannot be said that the declination was the sole or primary cause of the conditions Professor Begay described, it also cannot be ignored that IHS's actions ran directly contrary to the purpose of the ISDA.  In issuing its declination, IHS directly harmed the community it was charged with serving under a statutory scheme that explicitly recognizes the imperativeness of self-determination in light of a history of oppressive and persecutory policies.

The Court now turns to the testimony of Peterson Zah.  Like with Professor Begay's testimony, the Court struggled to identify which of Mr. Zah's asserted damages were actually attributable to Defendants' actions.  Mr. Zah stated that the Ramah Navajo people's hopes and dreams were destroyed when Defendants declined their contract proposal.  The Court found this statement to be sincere, but exaggerated.  On multiple occasions throughout the three-day hearing, Plaintiff's counsel and witnesses took efforts to highlight the fact that the Ramah Navajo tribe has been a leader in the self-determination movement and has assumed control over a variety of services pursuant to the ISDA.  Given these circumstances, the Court believes that the declination of one contract proposal, which embodied a small subset of health care services, could not have completely destroyed the people's hopes and dreams.  Such an easily defeated community never would have become the pioneer that it became in the self-determination movement.

Dr. Neuberger was largely correct that RNSB failed to prove a sufficient connection between the declination and the social pathologies Plaintiff's witnesses described.  However, by his own admission, Dr. Neuberger is not qualified to testify as to the question of damages that cannot be translated into a dollar amount.  For example, Dr. Neuberger stated that he has

70

provided expert testimony on the topic of hedonic damages only insofar as he was able to rely on concrete studies in the field of behavioral economics that assign value to the loss of enjoyment of life.  As the category of damages in this case is a novel one on which no studies have been conducted, the Court will disregard the portion of Dr. Neuberger's testimony that related to the role of language and culture – or lack thereof – in the calculation of damages.

In conclusion, although the Court believes that Plaintiff successfully proved some measure of intangible damages in this case, most of the examples Plaintiff's witnesses provided were too attenuated from the declination to merit a damages award.  The evidence did not show that the social pathologies to which Professor Begay and Mr. Zah testified can be attributed to the declination.  Plaintiff's experts did, however, convince the Court that RNSB suffered distinct harm when the declination prevented it from assuming control over mental and behavioral health care services that would have begun to address some of these pathologies.  Dr. Neuberger did not persuade the Court that no intangible damages should be awarded due to Plaintiff's failure to advance a formula for their calculation.

In arriving at its conclusion regarding intangible damages, the Court primarily considered the theme advanced by Professor Begay and Dr. Jorgensen – which they supported with substantial research – that self-determination is critical to a tribe's economic development.  The crux of Dr. Jorgensen's testimony was that self-determination policy results in

> safer, healthier, happier, more prosperous communities along many measures of community development . . . .  As tribes increase their self-determination, as tribes take on more self-determination and as they develop institutions that are their own and that have cultural fit and legitimacy within those communities, those are the tribes that are advancing in economic and community development.

Doc. 131 at 82:18-87-22.  In light of these facts, the Court concludes that Defendants'
declination and Plaintiff's consequent inability to advance their self-determination efforts
compels an award of $500,000 in intangible damages.

## CONCLUSION

In summary, the Court **FINDS** as follows:

(1) Plaintiff satisfied its burden of proving its entitlement to the following categories of tangible
damages:

(a) $361,862.80 in lost tribal shares;

(b) $144,745.12 in lost third-party reimbursements;

(c)  $0 in lost increased economic activity attributable to the economic multiplier effect;
and

(2) Plaintiff satisfied its burden of proving its entitlement to intangible damages in the amount of
$500,000.

Defendants are **HEREBY ORDERED** to pay Plaintiff damages in the amount of
$1,006,607.92.

It is **FURTHER ORDERED** that the parties advise the Court as to the status of their
negotiations with respect to the issue of contract support costs, in light of the Supreme Court's
decision in *Ramah Navajo Chapter v. Salazar*, 132 S. Ct. 2181 (2012).

Dated this 9th day of May, 2013.

**MARTHA VÁZQUEZ**
**UNITED STATES DISTRICT JUDGE**

*Attorneys for Plaintiff:*
Michael P. Gross
Daniel H. MacMeekin
Jake Eugene Gallegos

*Attorneys for Defendant:*
Justin Michael Sandberg
Patrick Nemeroff
Jan Elizabeth Mitchell
Thomas Zimpleman